**Dale Arthur
CARRASQUILLO, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–86–089–CR.**

Court of Appeals of Texas,
Fort Worth.

Dec. 23, 1987.

Moore & Smiddy, John D. Moore and Mike A. Smiddy, Mineral Wells, for appellant.

N.A. Irsfeld, Dist. Atty., Palo Pinto, for appellee.

Before FENDER, C.J., and HILL and KELTNER, JJ.

## OPINION

FENDER, Chief Justice.

Appellant, Dale Arthur Carrasquillo, appeals from a conviction by the jury for capital murder. *See* TEX.PENAL CODE ANN. sec. 19.03 (Vernon Supp.1987). The jury assessed punishment at life confinement in the Texas Department of Corrections. Appellant alleges thirteen points of error.

We affirm.

On February 9, 1984,. the body of John Howard Basham, the victim, was found in the back of the victim's Volkswagen van off Interstate Highway 20, Palo Pinto County. The victim's pockets had been turned inside out and items from his wallet were found discarded down the interstate.

After an investigation, appellant was charged with intentionally causing the death of Basham, "while the said Dale Arthur Carrasquillo was in the course of committing, and attempting to commit, the offense of robbery of John Howard Basham."

Appellant's first point of error challenges the trial court's exclusion of venireman Middleton for his views on the death penalty. To determine whether a prospective juror may be excluded for cause because of his views on capital punishment, the inquiry is whether the juror's view would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his

oath. *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980); *see also Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851 (1985).

In an analysis of the propriety of a ruling upon a challenge for cause, the impact of voir dire of the prospective juror must be taken as a whole. *See Barrow v. State,* 688 S.W.2d 860, 861–63 (Tex.Crim. App.1985). In the instant case, during the initial questioning by the prosecuting attorney the following testimony occurred:

[BY MR. ASHBY] First of all let me ask you—I guess you're probably aware of course by now that this is a death penalty case. How do you feel about the death penalty?

A. Well, I don't know. To be truthful with you, I really never thought about it, you know.

Q. Some people just—

A. I think in some cases, if a man is—you know is in his right—he knows that he shouldn't have done what he did, you know—I don't know—I think maybe sometimes you ought to give another man a chance too.

Q. In other words you're not for the death penalty in every case.

A. I wouldn't say—If I had to be the one that said "yes", I don't know if I could do that to a man. I'd have to think about it real hard.

Q. I'm going to have to ask you to think about it because if your feelings against the death penalty would substantially impair your ability to do what the Court's going to tell you to do, which would be if the defendant is found guilty of capital murder you'd have to answer three questions. And I'll go over that with you later. But I'll tell you the result. If you answer those three questions "yes", you would in effect, assess the death penalty.

The Court's going to assess it after you do that. Okay. Now what I need to find out, if you can just tell me, would your—do you have any feelings against the death penalty which would impair your ability to do that?

A. Well, no. I don't think I'm totally against it. You know, I think if a person —like I said if he's in his right mind and all and knows he's done wrong and according to what he's done, I think you have to think about that. That's my opinion about that. I don't know that I could—I'd just have to think about it. I'll say this, that if a person was wrong in what he done and he knows it was wrong and whatever it was he done was so bad, I could say "yes". I believe the death penalty would be right if he's done this to somebody and knowing that he shouldn't have done it.

The prosecuting attorney then explained to Middleton about the special issues asked of a juror in a capital felony case and whether Middleton would have any difficulty in answering each of them. After Middleton answered no, the following testimony occurred:

Q. Considering everything that you can think of, your feelings about capital punishment, whatever else you think might be important for you to consider, if the evidence justified it, could you answer those three questions "yes" knowing that the result of that's going to mean this man's probably going to die?

A. Well I don't know. I don't know if I could do that or not. I'd have to really—you know I don't know.

Q. I hate to put you on the spot but that's my job and I've got to do it today. And the way I have to ask this is would your feelings about the death penalty or your questions that are in your mind there concerning your beliefs about the death penalty, would they substantially impair your ability to answer these three questions "yes", if you really knew in your mind that the answer was "yes".

A. I think so.

At this point the prosecuting attorney challenged Middleton for cause and defense counsel was given an opportunity to ask Middleton a few more questions before the trial judge ruled:

Q. What I'm after is we all have, I think, different opinions about how the death penalty ought to work and ought

not to work. You're entitled to that as much as anybody is. We're not trying to get you to change your mind. What I'm asking you is would your views of the death penalty substantially impair your performance as a juror in the sense of following the Judge's instructions under the oath that he has asked you to take already?

A. Well I tell you what, the best way for me to answer that question is I'm not against the death penalty, really. I mean—but I don't know if I was in the position of that, that—you know, I really don't know. I guess so. I mean I'm not saying I could or I couldn't. I'd have to think real hard on it, real serious.

Q. We're asking you to make a decision without having heard any of the facts. Do you understand that? But we have to know at this point if you could follow the instructions.

A. I could and I'm not saying—in my mind if I thought that the man should get the death penalty I could vote, you know I could go that way, if I thought— Yes.

The trial judge in order to clarify what Middleton would base his decision on elicited the following testimony:

THE COURT: What I hear Mr. Ashby asking you is when you went to answer the three questions, would you be able to ask answer them just purely from the evidence that's been presented in court, or is that business that's going to be in the back of your head? Is that going to interfere with you giving the correct answer based only on the evidence presented in court. And I heard your answer to be that the idea that's back in the back of your mind is such that you would not be able to base your decision solely upon the evidence that's been presented in court. And I want—

VENIREMAN MIDDLETON: Maybe I guess I misunderstood the question. You know. I would base my decision on what I hear, you know, and what I see and what I understand.

THE COURT: On the evidence that's presented in court.

VENIREMAN MIDDLETON: Yes, sir.

On Middleton's final response, the trial judge overruled the challenge for cause.

Once again the prosecuting attorney examined Middleton.

Q. Well of course only you know how you feel about the death penalty. But these three questions will be ask of you, and just the same as—you know if it were phrased differently and if you were asked at the conclusion of this trial, "Do you assess his penalty at death or life in prison."

A. Yes, sir.

Q. Could you come to a conclusion about that based upon the facts without being clouded by your feelings of something in the back of your mind there that says you're really not sure about that.

A. Yes, sir.

Q. You could do—

A. Do not let—what you're asking me is on the way I—You're asking me if I'm for the death penalty or against it, right?

Q. I did ask you about that, and then the last thing, of course I was asking you was would your—you indicated to me—

A. If I would let that interfere on capital murder, right?

Q. As I understood you to tell me, you really were not for the death penalty but you didn't know exactly how you felt about it.

A. I'd still be like that. I'm not so sure on the death penalty. I don't know if I could, really. I'm cloudy about that.

Q. You just really don't know if you could do it?

A. That's right.

The prosecutor's renewed challenge for cause was this time sustained. A reading of the testimony of Middleton indicates he was unable to say with any kind of certainty how his views on the death penalty would affect his deliberations. However, the inability to deny or confirm any effect whatsoever is not equivalent to an unwillingness or inability on the part of the ju-

rors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. *Adams*, 448 U.S. 38, 49, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581, 592. Middleton's reiterated response that he had to "think about it [death penalty] real hard" indicates that he would view his task with great seriousness and gravity. Middleton's response does not demonstrate an inability to follow the law or obey the instructions of the trial court. In fact, Middleton at one point stated that he could follow the court's instruction even in light of his views on the death penalty.

Although the questioning of Middleton at times lacked clarity and the venireman admitted to be confused by such, we hold, in viewing Middleton's testimony as a whole, that the trial judge improperly excluded Middleton for cause based on his views on the death penalty. However, we conclude the trial court's error was harmless.

█ The test for harmless error is whether there is a reasonable possibility that the error complained of might have contributed to the conviction or affected the punishment assessed. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340, 345 (1972); *Johnson v. State*, 660 S.W.2d 536, 538 (Tex.Crim.App.1983).

Appellant complains of a juror's improper exclusion for his views on the death penalty, yet the selected jury assessed punishment at life imprisonment. In light of the fact that the death penalty was not imposed, we cannot see how the improper exclusion of Middleton based on his views of the death penalty could have affected the actual punishment assessed. Appellant's point of error one is overruled.

█ Appellant's second point of error complains of the trial court overruling appellant's motion to dismiss based on the State's release of evidence, i.e., a Volkswagen Camper–Van. On January 9, 1986, appellant filed a second supplemental motion for discovery requesting the inspection of a 1973 Volkswagen Camper–Van owned by the victim and in which the victim's body was discovered. At a pre-trial motion on the hearing, Sheriff John Turpin testi-

fied the van was impounded by an officer and kept in the Palo Pinto County Law Enforcement Center, and that it had subsequently been turned over to the possession of the victim's wife. The testimony at trial indicated the release was somewhere around 90 days after the commission of the offense.

Appellant treats the State's inability to make the van available to defense counsel as a withholding of evidence favorable to the accused, denying him due process. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). Appellant's argument must fail. Appellant's motion for discovery requesting the van was filed nearly two years after the occurrence of the crime, and the State at the time was neither in possession of or had access to the evidence. Thus, we find no breach of the prosecutor's constitutional duty to disclose evidence favorable to the accused. Nor do we find it unreasonable that the State released the van to the victim's wife prior to appellant's request since the van had obvious value and utility to the victim's family.

Appellant relies on *Easley v. State*, 454 S.W.2d 758 (Tex.Crim.App.1970) and *Durrough v. State*, 672 S.W.2d 860 (Tex.App.— Corpus Christi 1984), *aff'd*, 697 S.W.2d 760 (Tex.App.1985) to support his contention that he was denied his constitutional right of confrontation due to the loss of evidence. However, these cases are factually distinguishable from the case at bar.

In *Durrough*, 672 S.W.2d 860, the lost evidence was a TV newsreel film and a photographic spread (mugshots) which could have been crucial to the identification of appellant. *Id.* at 870–71. In essence, the lost exhibits were necessary to the proof of the offense. In the present case, appellant claims the loss of the van prevented the taking of various blood samples which would have demonstrated that appellant was coming to the defense of another who had been attacked by the victim. The early release of the vehicle also prevented a test to be done on wires from the steering column to show someone else had attempted to hot-wire the vehicle. Thus, the

van had only ancillary value in the case going to appellant's alleged defense theories. The van was not vital to the proof of the actual offense.

Appellant's reliance on *Easley*, 454 S.W. 2d 758, is misplaced. In *Easley* the Court did not find it necessary to address the denial of defendant's due process rights based on the State's failure to preserve fingerprints and blood samples, because the matter was not raised by a motion for discovery or by a motion for new trial. *Id.* at 762. Appellant's point of error two is overruled.

■ Appellant argues in his third point of error that the trial court erred in failing to grant appellant's motion for an instructed verdict based on insufficient evidence of robbery. In reviewing the sufficiency of the evidence in either a direct or circumstantial evidence case, we must view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Crim.App.1984); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984) (opinion on reh'g). If there is evidence which establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds. *See Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim. App.1984).

■ Applying the above standard, it is necessary to review the evidence as it relates to the proof that appellant committed the murder while in the course of committing or attempting to commit robbery. *See Cruz v. State*, 629 S.W.2d 852, 858–59 (Tex. App.—Corpus Christi 1982, pet. ref'd). Basham's pockets had been searched through and were left turned inside out. Basham's wallet was picked through and items discarded in a line strewn down the interstate. In fact, appellant admitted to the undercover policeman, Gary Davis, that, "they met a guy in a bar, and that this individual had a lot of money. And that they ended up up on a freeway some-

where with him and that they cleaned him out of his money." From these facts, any rational trier of fact could have found that the murder of Basham was committed in the course of a robbery beyond a reasonable doubt. Appellant's point of error three is overruled.

■ In appellant's *fourth point of error*, he urges that the trial court erred in excluding testimony about prior homosexual experiences of the victim from a defense witness, Snyder. Generally, evidence of a person's character is not admissible to prove he acted in conformity therewith. However, TEX.R.CRIM.EVID. 404(a)(2) is an exception to the general rule and permits, "evidence of a pertinent trait of character of the victim of the crime offered by the accused ... or evidence of peaceable character of the victim offered by the prosecutor in a homicide case to rebut evidence that the victim was the first aggressor." Although TEX.R.CRIM.EVID. 404(a)(2) became effective five months subsequent to the trial of the instant case, the so-called Dempsey Rule basically sets forth the same requirements for admission of the victim's character. *Dempsey v. State*, 159 Tex.Crim. 602, 266 S.W.2d 875, 878 (1954) (evidence of prior aggressive acts of the victim are admissible if there is evidence of an act of aggression by the victim which raises a self-defense issue); *see also Davis v. State*, 690 S.W.2d 20, 21 (Tex.App.—Beaumont 1985, pet. ref'd).

■ Appellant's argument that the victim's homosexuality, indicative of his sexual misconduct, illustrates the victim's violent character and aggression is weak at the least. However, even if we accepted appellant's proposition as true, the exclusion of the evidence would be harmless. On cross-examination of a State's witness, Officer Davis, the officer acknowledged that during his undercover contact with appellant and his accomplice that they referred to the victim several times as a homosexual. Furthermore, Officer Bishop testified that he had talked to Snyder about the victim, and that she made reference to the victim buying some fruit in an area known to be a homosexual area in Dallas.

No objection was voiced by the State to either testimony. Thus, some evidence of the possible homosexual character of the victim was already before the jury, by State witnesses, without Snyder's direct testimony. We do not think the minds of an average jury would have found the State's case any less persuasive had the testimony been admitted. Appellant's point of error four is overruled.

Appellant next argues that the court erred in failing to admit into evidence the records of prior convictions of the victim. In light of the fact that on cross-examination of the victim's wife, testimony was heard without objection about the victim's past criminal convictions, the court's failure to admit the records of these prior convictions is harmless. Appellant's point of error five is overruled.

Besant–Matthews was the doctor who performed the autopsy on the body of Basham. The doctor testified that to his recollection the victim's blood type was "B," but that he did not have documentation of this fact presently in front of him. In response to the prosecutor's inquiry as to how the doctor had the occasion to recall such he stated, "[w]ell one of my recollection because I don't come out here very often. And I was reviewing a transcript of my prior statements in this case." No objections were voiced to this line of questioning. A subsequent recess allowed the doctor to call his office and obtain with certainty the victim's blood type. After the recess the doctor again took the stand and tried to testify over the hearsay objection of defense counsel as to the verified blood type of the victim. The objection was overruled, and appellant now complains in his sixth point of error as to the admission of the doctor's testimony.

The statement made by the witness after the recess was based on a third party's testimony who himself was relying on a written report outside the view of the courtroom and such should have been ruled hearsay. Nor do we agree with State that it falls under a hearsay exception pursuant to TEX.R.CRIM.EVID. 803(4) as a statement for the purpose of medical diagnosis or treatment. Nonetheless, since the doctor's initial testimony was heard based on the best of his recollection as to the victim's "B" blood type, the evidence of the victim's blood type was already before the jury, even if not with certainty. Thus, the trial court's subsequent admission of the doctor's testimony was harmless. Appellant's sixth point of error is overruled.

Appellant's point of error seven asserts that the trial court erred in overruling the challenge for cause of venireman Bradford. TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(9) (Vernon Pamph.Supp.1988) mandates that a prospective juror be dismissed for cause if "he has a bias or prejudice in favor of or against the defendant." When bias or prejudice is not established as a matter of law, the trial court has the discretion to determine whether bias or prejudice actually exists to such a degree that a prospective juror is disqualified and should be excused. *Anderson v. State*, 633 S.W.2d 851, 854 (Tex.Crim.App.1982); *Kennard v. State*, 649 S.W.2d 752, 764 (Tex. App.—Fort Worth 1983, pet. ref'd). We can, therefore, only overturn the ruling of the trial judge if, in light of all the answers given by a prospective juror, bias as a matter of law has been established. *Anderson*, 633 S.W.2d at 854.

Bradford's testimony revealed that he had been friends with one of the prosecutors for a long time. Nevertheless, the mere fact of acquaintance is not sufficient to disqualify a prospective juror if the panel member asserts that the acquaintance will not affect his judgment in the case. *See id.* Bradford's testimony in relevant part reads:

Q. Do you think that would render you not a fair juror?

A. I just don't know how to answer that. I've never been in that situation. I trust Mac's judgment. I always have. But you know I still would try to weigh —I'm just being honest. I could try. I think that I would listen—you know I would listen to what he said. I would try to listen to what you said. But I'm not saying that I could—you know, that I

could not listen to you less or listen to Mac more. I don't know. I would be—I would probably have a tendency to really listen to him and believe what he said.

Q. All right. Would it be fair to say that today, *without having any evidence,* you would be more tending to favor what Mac would say simply because he represents the State.

A. Because he represents the State?

Q. Or because you know him.

A. Not because he represents the State but because I know him.

Q. And that would weigh in your judgment?

A. I would hope it would not. But I don't know.

Q. You can't tell me that it wouldn't.

A. No. [Emphasis ours.]

Bradford did not acknowledge that the relationship *would* incline him against the defendant but rather that he was uncertain how his acquaintance with a prosecutor would affect his judgment. Viewing the testimony of Bradford as a whole, we conclude that bias as a matter of law has not been established by this record, thereby the matter of disqualification rested in the trial court's discretion. Point of error seven is overruled.

Next appellant complains that the trial court abused its discretion in excusing venireman Bass from the jury. The night prior to the beginning of voir dire, Bass had had an incident with his drunken ex-wife that involved a display of a gun and several police officers to control the disturbance. At the time of voir dire he felt his present wife and child were still in danger, and he wanted to remove them from town "to a hotel or something where they can be safe." Bass indicated he did not feel as though he was presently of sound mind. The judge then excused Bass until another week.

■■■■■ A trial court may exercise its prerogative and discretion in excusing jurors. *See Villarreal v. State,* 576 S.W.2d 51, 63 (Tex.Crim.App.1978); *Moore v. State,* 542 S.W.2d 664, 669 (Tex.Crim.App. 1976). Under the circumstances, the trial court did not abuse its discretion rescheduling Bass during the voir dire. Appellant's point of error eight is overruled.

■■■■■ Appellant's point of error nine complains that appellant was denied due process of law because the courtroom had the appearance of an "Armed Camp." We disagree.

In response to defense counsel's objection to the number and location of the law enforcement officers, the trial judge described the courtroom as follows:

[T]here are two officers seated behind the defendant, one of whom is wearing plain clothes, and the other of whom is wearing a blue shirt and uniform of some kind. There's an officer seated to my left here which would be the defendant's right, which is a Parker County deputy sheriff in a brown shirt.

And I will—Of course this gentleman is standing here but he hasn't been standing here during previous voir dire.

The record reflects there were only four officers in the courtroom at the time of appellant's objection. There is no showing that they caused confusion or distracted the attention of the jurors. We fail to see how the procedures employed in the case at bar involved prejudice that they can be deemed inherently lacking in due process. Appellant's ninth point of error is overruled.

■■■■■ In his tenth point of error appellant argues that the trial court erred in denying appellant's request that he personally view video tapes and listen to audio tapes before they are presented to the jury. The defense attorneys were given access to the tapes prior to trial, and at least one of the defense attorneys had viewed the tapes previously. Accordingly, the defense counsel was given ample opportunity to review the tapes prior to the tapes' presentation to the jury. Since the trial judge was unaware of any prejudicial effect of showing the video tapes, it was not unreasonable for him to find it unnecessary to take the time during the trial, while the jury sat in the jury room, to allow appellant to view the

tapes. Appellant's tenth point of error is overruled.

■ After the State rested its case, defense counsel commenced his opening statement and the following conversation occurred:

THE COURT: Mr. Moore, I believe that the provision of the code of criminal procedure would make it appropriate that you outline what you expect to prove or hope to prove.

MR. MOORE: All right. Before I get into that what ruling the Court would have concerning the witness Karen Snyder. Am I allowed to tell this jury what I think she's going to testify to before you rule on whether or not she's going to be able to testify? That's the reason I didn't want to get into it, Judge.

THE COURT: No, sir. You would not at this point be permitted to mention to the jury anything that at this point, you think might not be admissible.

Appellant complains in point of error eleven that the trial court erred by limiting defense counsel's opening statement in such a manner. Appellant cites no authority for his contention nor do we find any authority in support of his contention. We do not see how the court's comment could be interpreted as a prejudicial opinion about the defense or its witnesses. Point of error eleven is overruled.

Appellant's last two points of error complain that the trial court erred in commenting to the jury on the weight of the evidence. Upon direct examination of a State's witness, defense counsel objected to a certain line of questioning. Thereupon, the court asked the State the purpose of the line of questioning. The State explained that the questioning was in anticipation that there would be evidence concerning appellant's statement about burning the van. The court then overruled appellant's objection. The second comment appellant complains about occurred when the trial judge overruled a hearsay objection by defense counsel.

■ To constitute reversible error in a judge commenting upon the weight of the evidence, the comment must be such that it is reasonably calculated to benefit the State or prejudice the defendant's rights. *McClory v. State*, 510 S.W.2d 932, 934 (Tex.Crim.App.1974).

■ Insofar as the first comment is concerned, we do not view the trial court's action of merely requesting the State to clarify its line of questioning before making a ruling on the objection as being a comment on the weight of the evidence.

■ As for the second comment, we must review it in the context in which it arose. The victim's wife was testifying as to the occasion when she first became alarmed that her husband might be missing. The testimony, in relevant part, continues as follows:

Q. Okay. What was the next thing that happened that alarmed you?

A. Well, I called my son who lives in Fort Worth, and told him his father was late coming for me. And he drove over to Dallas to SMU to where the meeting was to be held—

MR. MOORE: Your Honor we object to that. That would be hearsay what her son might have done out of her presence and would not be proper testimony.

MR. ASHBY: Your Honor that information is not offered for the truth of the matter stated.

THE COURT: Mr. Moore I'm going to overrule that. That appears to be a very small item there.

The trial judge's comment indicates that the content of the testimony itself may not have been so important as to sustain a hearsay objection. It should be noted that the witness was a State's witness on direct examination. Accordingly, such a comment regarding the State's evidence could not be calculated to benefit the State or to prejudice the defendant. Appellant's points of error twelve and thirteen are overruled.

The judgment of the trial court is affirmed.