**Cornelia ROSALES, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 12–93–00110–CR.

Court of Appeals of Texas, Tyler.

July 31, 1995.

Discretionary Review Refused Nov. 15, 1995.

James B. Johnston, Dallas, for appellant.

Edward J. Marty, Tyler, for appellee.

HADDEN, Justice.

A jury found Appellant guilty of the offense of injury to a child and assessed punishment at 50 years confinement in the Texas Department of Criminal Justice–Institutional Division. She raises 24 points of error on appeal. We will affirm.

### SUFFICIENCY OF THE EVIDENCE

In points of error two through six, Appellant contends that there is insufficient evidence to sustain the allegations contained in the indictment and submitted to the jury. At the time of the offense, TEXAS PENAL CODE, section 22.04(a)(4) provided, in pertinent part, that a person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that causes to a child serious bodily injury. TEXAS PENAL CODE, section 1.07 defines "serious bodily injury" as bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

In the instant case, the indictment read, in relevant part, as follows:

> ... that on or about the 23rd day of February, 1991, ... CORNELIA RO-SALES did then and there intentionally and knowingly act and engage in conduct that caused serious bodily injury to [A.R.], a child younger than 14 years of age, by then and there failing to provide food and nourishment; at a time when CORNELIA ROSALES had care, custody and control of said child and had a legal duty as the mother of said child to provide protection, food, shelter, and medical care for said child;

> ... that on or about the 23rd day of February, 1991, ... CORNELIA RO-SALES did then and there intentionally and knowingly act and engage in conduct that caused serious bodily injury to [A.R.], a child younger than 14 years of age, by

then and there failing to seek the medical care necessary....

■ In reviewing the sufficiency of the evidence, this Court must view all of the evidence in the light most favorable to the verdict, then determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Jones v. State,* 833 S.W.2d 118, 122 (Tex.Cr.App.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993).

In the instant case, the evidence shows that on February 21, 1991, a confidential informant told Tyler Police Officer, Luis Correa ("Correa") that there was a problem with a female child ("A.R.") at 511 West Oakwood Street. The next day, Correa and Tyler police officer Richard Drew made a "welfare concern call" to the house at 511 West Oakwood Street. Correa met Appellant and asked her about her daughter, A.R., to which she replied that she had no daughter by that name. She showed the officers her other six children and allowed the officers to walk through the house. When the officers attempted to open the bathroom door, Appellant stood between them and the door and would not allow them to look in the bathroom.

The next day, a confidential informant contacted police department dispatcher Martha Vargas ("Vargas"), and stated that a child was being abused at 511 West Oakwood Street. The informant stated that when the officers were there the day before, the child had been hidden in the bathroom with her father, Bertine. Based upon this information, Tyler police officer Tom Deal ("Deal") and his back-up, Tim Lowndes ("Lowndes"), were dispatched to that address. Thirteen Hispanic children were found in the house, some of whom were identified as the "Cornelio" family. No adults were there.

When Deal asked the older children where A.R. was, he was directed to the kitchen area. He found a small child on a filthy area of the floor between the refrigerator and the cupboard. According to Officer Deal, the child looked to be in "bad health." When Deal picked the child up, she "clung to me ... grabbed onto me ... [and] she didn't want to let go." Upon examining A.R., the officers found numerous bruises on her face, stomach, and on her legs all the way down to her feet. A fresh bruise mark was found across the front of her stomach and chest area, and a burn mark was found on her lower back. Also, a piece of thick yarn was tied around her right wrist. The officers could not locate the parents, but were informed by the other children that they were at work. Since the children were Hispanic, Deal reported the situation to Vargas, who spoke Spanish. Vargas came to the house to help with the children. The children voluntarily informed the officers that A.R.'s parents "beat her the night before because she would not stop crying," and that the yarn was "used to tie [A.R.] to the wall." They stated that A.R. was "not fed enough because they did not want her using too many pampers." A.R. appeared to be about six to eight months old and very underweight, but the officers were informed that A.R. was actually 17 to 18 months old. A.R. appeared to be lethargic, except for a brief moment when "one of the kids was throwing away a husk of corn and [A.R.] made a movement towards the husk of corn."

Vargas described A.R. as being very thin and dehydrated, with dry skin, hollow eyes, and bruises all over her body. Vargas testified that one 12 year old child, Alcareli Gandarrila ("Alcareli"), was very excited that the police were there and blurted out several times that A.R. was "repeatedly abused ... they whipped her last night ... they don't feed her ... and one day when it was very cold that A.R. had been crying a lot and they put her outside in a basket of clothes without any clothes on while she cried."

Because of the condition of A.R., the officers called Child Protective Services of the Department of Human Services. Alette Kennedy ("Kennedy"), a trained investigative worker, was dispatched to the house. Kennedy examined A.R., interviewed the police officers and the children, and determined that A.R. needed to be seen by a physician. She left a State Emergency Removal Form with the oldest child and took A.R. to the

emergency room of Medical Center Hospital in Tyler.

During her investigation, Kennedy determined that the parents of A.R. were Bertine Cornelio ("Bertine") and Appellant. Several of the witnesses who testified confirmed that A.R. was the daughter of Appellant and her husband, Bertine, and that A.R. lived with her parents at 511 West Oakwood, Tyler, Texas. When Kennedy interviewed Appellant, she admitted that she and Bertine were the parents, and that she hid A.R. in the bathroom from the officers. Appellant further admitted that when A.R. cried, she would be placed in a closet or outside. She twice hit A.R. with a television cord. Kennedy stated that the other six Cornelio children were "doing fine" as of that time.

At the hospital emergency room, A.R. was listless, withdrawn, and was not reacting at all. The emergency room nurse described A.R. as having bruises, cuts, and burns, and was suffering from dehydration, malnutrition, and a urinary tract infection. She weighed only 12.9 pounds, which was not normal for a 17 to 18 month old child. The nurse testified that the environment from which A.R. came created a substantial risk of death. A.R. was examined by the emergency room physician and received 16 ounces of Pedialite and 8 ounces of milk, which she consumed voraciously. Because of her dehydration, it took a considerable amount of time to get a urine sample. While at the emergency room, A.R. was non-reactive except for eating. The emergency room physician would not release A.R. except to a "caring person." A.R. was then placed in a foster home where she began to make a satisfactory recovery.

Within four days of being removed from the home, her foster parents took A.R. to a pediatrician, Dr. Rick Rogers ("Rogers"), for a complete examination. Rogers testified that A.R. was suffering from extreme malnutrition, a protein-calorie deficiency, multiple bruises and whip marks, and that she was lethargic and very withdrawn. Rogers described A.R. as follows:

> ... this child had relatively long arms and legs compared to body weight and was obviously malnourished, severely malnour-

ished and very weak. There was very little muscle mass, there was almost no gluteal tissue. I mean, normally babies at this age have large bottoms and this baby basically had no muscle mass in the bottom. The head was relatively large for the body because the brain and brain growth is spared more than muscle tissue. So the baby looks like she has a big head and the arms and legs are too long. The baby was severely malnourished to answer your question.

Rogers stated that he had never seen a child this malnourished, and said that she was obviously a starving child. A.R., at the age of 17 months, weighed the same as an average four month old baby, and was the average height of a nine month old baby. A.R. had no other medical problems which would explain her extreme malnutrition; the only explanation being "nutritional neglect." Rogers stated that her malnutrition was not a lifetime condition, but of recent origin. Rogers agreed that an untreated urinary tract infection poses a substantial risk of death or the protracted loss of use of a bodily member or organ. Rogers continued that, "the condition she was in, I try to imagine how long she could live in that current condition and ... could not imagine the scenario that a child could survive a month or two months at that current nutritional state." He agreed that because of lack of food and nourishment and the lack of necessary medical care, A.R. would be at a substantial risk of death in the condition she was in when she was brought to the hospital emergency room. Further, it was his opinion that A.R.'s desperate condition would be obvious even to people who are not medical experts, and that any parent who saw a child like this should recognize that there was a serious problem. Rogers concluded that at the time of his examination, A.R. was suffering from a serious physical deficiency or impairment which rose to the level of serious bodily injury.

A significant witness for the State was Mary Lou Albarran ("Albarran"), who is a niece of Bertine. Albarran lived in the garage apartment behind the Cornelio home and spent a great deal of time with the family. She testified that Appellant would

instruct baby-sitters not to change A.R.'s diaper. She stated that A.R. was kept in a box inside a dark closet or outside on the porch, even in the winter time, wearing only a thin little shirt and dirty diapers. Sometimes, when Albarran would walk over to the Cornelio house, she would see A.R. outside in the box weeping. She was told not to check on A.R. because it would anger Appellant and Bertine. Albarran knew that Appellant didn't like A.R. because of "just stuff she said about her, like get her out of here she makes me sick." Several other witnesses testified that they had heard Appellant make the same remark about A.R.

Albarran testified that there were two refrigerators in the house and the family always seemed to have plenty of food to eat. At meal time, all of the other kids would be fed, but she never saw A.R. at the table eating with the rest of the family. She never saw Appellant prepare A.R. a plate of food and give it to her. A.R. was usually in a box outside the door. Albarran did see A.R. eat things she thought were inappropriate, such as banana peels and roaches which she would get from the trash. Albarran once saw a friend give A.R. some food, but Appellant "grabbed it from her and threw it in the trash." She testified that the other children in the family did not look like A.R. They ate regularly and were happy and playful. A.R. could not run around and play like the other kids, but would "just kind of drag around and all that. She couldn't even stand up."

One day, while the Cornelio family was gone to Canton, Albarran looked in the window of the house and saw A.R. with her hands tied to the bedroom wall. Her feet were touching the floor, but she could not sit down. Appellant and Bertine had left the house at 7:30 or 8:00 A.M. and did not return until 5:30 P.M. A.R. remained tied to the wall during this period.

After A.R. was removed from the home, Appellant and Bertine spoke to Albarran about getting involved. Appellant said to Albarran that "she could do whatever she wanted with [A.R.], that was her kid and it was nobody's business and that she could kill her if she wanted to and that she didn't have to feed her or do anything." Albarran heard Appellant speak of A.R. as being "ugly," and that she was "chappa," meaning cheap or less than the other kids.

■■■ The above evidence, which was provided by the police officers, the Department of Human Services case workers, the medical personnel, and the eye-witnesses in the home, clearly established that Appellant intentionally inflicted serious bodily injury upon A.R. Appellant argues that the evidence fails to establish the element of serious bodily injury since A.R. was successfully treated in the emergency room, and suffered no significant long term effects from the abuse. However, the relevant issue in determining serious bodily injury is "the disfiguring or impairing quality of the injury *as it was inflicted,* not after the effects have been ameliorated by time or medical treatment." *McCann v. State,* 695 S.W.2d 791, 792 (Tex. App.—Texarkana 1985, no pet.) (emphasis added); *See Brown v. State,* 605 S.W.2d 572, 575 (Tex.Cr.App.1980). The evidence established A.R.'s state of extreme dehydration and malnutrition, which caused her to be lethargic, unhealthy, and very underweight. Rogers testified that A.R. was at a substantial risk of death when she was taken to the emergency room, and that she would not have survived for long in her current nutritional state. Clearly, the impairing quality of the starvation at the time of its infliction proves that A.R. suffered serious bodily injury. Therefore, viewed in the light most favorable to the guilty verdict against Appellant, we hold in this case that there was sufficient evidence whereby a rational trier of fact could have found all of the essential elements of the offense of injury to a child beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 at 320, 99 S.Ct. 2781 at 2789; *Jones,* 833 S.W.2d at 122. Points of error two through six are overruled.

### HEARSAY

Appellant contends in points of error seven through ten that the trial court erred in admitting hearsay evidence from Lowndes, Vargas and Deal. Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter

asserted. TEX.R.CRIM.EVID. 801(d); *See Schaffer v. State*, 777 S.W.2d 111, 115 (Tex. Cr.App.1989).

■ In point seven, Appellant complains of the testimony of Officer Lowndes, in which he recalls a statement made to him by A.R.'s sister: "She stroked [A.R.] on her hair and she told me that she loved [A.R.] even though her mom and dad didn't—." The evidence was offered in the context of Lowndes' account of his investigation of the home, and was used to show why the officers contacted the Department of Human Services. We hold, as the State argued at trial, that the statement did not constitute hearsay since it was offered merely to show what was said, and not for the truth of the matter asserted. *See* TEX.R.CRIM.EVID. 801(d). Thus, no error is shown. Point seven is overruled.

■ In point nine, Appellant contends that the trial court erred in admitting statements made by an informant through the testimony of Vargas. Vargas testified that a person, who identified himself as a supervisor at Loggins, told her that a child was being neglected at 511 West Oakwood, and was being hidden when police officers first came to the house. It was from this report that Officers Lowndes and Deal were dispatched to the address and discovered the abuse of A.R. by Appellant. Appellant asserts that it was error to admit the evidence since it constituted hearsay. The State maintains that the statement is admissible because it was offered only for the purpose of explaining the response of the police dispatcher and officers, and not for the purpose of proving the matters asserted therein. We agree. Because the statement was offered for this limited purpose and not to prove the truth of the matter asserted, it is not objectionable as hearsay. *Jones v. State*, 843 S.W.2d 487, 499 (Tex.Cr.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Jordan v. State*, 852 S.W.2d 689, 693 (Tex. App.—Houston [14th Dist.] 1993), *aff'd*, 883 S.W.2d 664 (Tex.Cr.App.1994).

■ In points eight and ten, Appellant argues that the trial court erred in admitting the hearsay statements made by Alcareli to Vargas and Deal. When Vargas and the officers arrived at the house, one of the children, Alcareli, became very excited that the police were there and blurted out various statements about A.R.'s treatment by her parents. Alcareli told Deal that the yarn around A.R.'s wrist had been used to tie her to the wall, and that A.R.'s parents had beaten her the night before. These statements were admitted through the testimony of Vargas and Deal.[1] Again, in reviewing the record, it appears that these statements were offered by the State not to prove the truth of the matters asserted therein, but to explain the role of the police officers in the case, and to show why it was necessary for them to call in the Department of Human Services to investigate. *See Jones*, 843 S.W.2d at 499; *Jordan*, 852 S.W.2d at 693.

■ In addition, the admission of both the supervisor's and Alcareli's statements was rendered harmless when the same facts contained in the statements were established through other unobjected-to evidence in the record. It is well settled that the admission of hearsay evidence does not constitute reversible error if the same facts were proven by evidence introduced without objection. *See Thomas v. State*, 621 S.W.2d 158, 164 (Tex.Cr.App.1980); *Brasfield v. State*, 600 S.W.2d 288, 296 (Tex.Cr.App.1980), *rev'd on other grounds, Janecka v. State*, 739 S.W.2d 813, 819 (Tex.Cr.App.1987). If the fact to which the hearsay relates is sufficiently proven by other competent and unobjected-to evidence, admission of the hearsay is properly deemed harmless. *Livingston v. State*, 739 S.W.2d 311, 333 (Tex.Cr.App.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Ladner v. State*, 868 S.W.2d 417, 424–25 (Tex.App.—Tyler 1993, pet. ref'd).

In the instant case, it was uncontroverted that Appellant and Bertine were A.R.'s parents, that A.R. lived with them at 511 West Oakwood, and that they were responsible for

---

1. Alcareli was called as a witness but refused to admit to any facts contained in these excited statements.

the care, custody, and control of A.R.[2] *See Ahearn v. State,* 588 S.W.2d 327 (Tex.Cr. App.1979). Albarran testified that she personally witnessed the abusive treatment of A.R. by Appellant and Bertine. Both Kennedy and Albarran testified that Appellant had admitted that she hid A.R. from the police, whipped the child with a T.V. cord, and placed her in a closet or outside. Albarran saw A.R. eat nothing but banana peels and roaches, and testified that Appellant would actually take food away from A.R. that others had given to her. After A.R. was taken from the home, Appellant told Albarran that "she [Rosales] could do whatever she wanted with A.R., that was her kid and it was nobody's business and that she could kill her if she wanted to and that she didn't have to feed her or do anything." Numerous witnesses testified as to A.R.'s extreme malnourishment, the injuries on her body, and her obvious desperate condition. These facts were also shown through uncontroverted medical testimony.

Our review of the record reveals that the facts to which the hearsay statements related are sufficiently proven by other competent and unobjected-to evidence. Applying the principles set forth in *Thomas* and *Livingston,* we conclude that the introduction of the complained-of hearsay statements was not reversible error since it was cumulative of other evidence that had been admitted without objection. Accordingly, points of error eight through ten are overruled.

■ In point of error 11, Appellant asserts that the trial court erred in admitting the hearsay statements of Estella Gandarrila ("Gandarrila") through the testimony of witness Maria Molina ("Molina"). The State claims that Gandarrila, a neighbor and frequent visitor in Appellant's household, had shown great concern regarding A.R.'s condition. Gandarrila had expressed that concern to Molina and requested Molina to report these matters to the authorities. However, at trial, Gandarrila denied ever having made such statements to Molina. As a result, the State called Molina as an impeachment witness. Appellant lodged a hearsay objection,

but the trial court allowed Molina to testify. At the conclusion of Molina's testimony, however, the trial court gave detailed jury instructions on the law of impeachment, and concluded by telling the jury not to consider Molina's impeaching testimony as any evidence against Appellant. Since Molina's testimony was introduced for the limited purpose of impeachment, it would not constitute hearsay because it would not have been offered for the truth of the matter asserted. *See Holifield v. State,* 827 S.W.2d 623, 624–25 (Tex.App.—Beaumont 1992), *rev'd and remanded on other grounds,* 843 S.W.2d 572 (Tex.Cr.App.1992); *Sandow v. State,* 787 S.W.2d 588, 595 (Tex.App.—Austin 1990, pet. ref'd); *see also,* TEX.R.CRIM.EVID. 801(d). The court reinforced this fact by specifically instructing the jury that they "*cannot* consider that impeaching testimony as *any* evidence of guilt." (Emphasis added.) Therefore, the trial court did not err in overruling Appellant's objection. Point of error 11 is overruled.

### COMMENTS BY THE COURT

■ In points of error 12 through 20, Rosales complains of comments made by the trial judge. We initially note that Appellant has waived any error regarding comments of the trial judge set out in points 15, 16, 17, and 19, by failing to object at trial. TEXAS RULE OF APPELLATE PROCEDURE 52(a) provides that the complaining party is required to object and obtain a ruling to preserve error for appellate review. If no objection is made to an allegedly improper comment by the court, nothing is presented for appellate review. *Varela v. State,* 561 S.W.2d 186, 192 (Tex.Cr.App.1978); *Lookingbill v. State,* 855 S.W.2d 66, 77 (Tex.App.—Corpus Christi 1993, *pet. ref'd* ). Accordingly, because Appellant failed to object to the trial judge's comments described in points of error 15, 16, 17, and 19, she has failed to preserve any error. These points of error are overruled.

In points 12, 13, 14, 18, and 20, Appellant addresses other comments to which objections were lodged. She insists that these comments conveyed to the jury the trial

---

**2.** The legal duty of care can come from either Section 12.04(3) of the TEXAS FAMILY CODE or the Criminal Non–Support Statute, Section 25.05 of the TEXAS PENAL CODE.

judge's impression of the case, his impression as to the credibility of the State's witnesses, and his impatience with the defense.

■■■ Section 38.05 of the TEXAS CODE OF CRIMINAL PROCEDURE governs comments made by the trial court, and provides as follows:

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at the verdict, make any remark calculated to convey to the jury of his opinion of the case.

To constitute reversible error, the comment must be reasonably calculated to benefit the State or to prejudice the rights of the defendant. *Becknell v. State,* 720 S.W.2d 526, 531 (Tex.Cr.App.1986); *Kincade v. State,* 552 S.W.2d 832, 835 (Tex.Cr.App.1977).

■■■ In point 12, Appellant complains of a comment made in conjunction with the court's ruling on an objection. The court overruled a defense objection to testimony as hearsay and gave an instruction as to the limited purpose for which it was admitted, as follows: "This testimony is being admitted by the court not for the truth of the statement but for the fact he was so told." TEXAS RULE OF CRIMINAL EVIDENCE 103(b) allows the court to add any statement which shows the character of the evidence, the form of which it was offered, the objection made, and the ruling thereon. The judge was properly explaining the law regarding the admission of the statement. *See Williams v. State,* 834 S.W.2d 502, 505 (Tex.App.—Fort Worth 1992, pet. ref'd). If any prejudice was shown by the instruction, it would appear to benefit the defense.

■■■ In point 13, Appellant complains of another comment made during a ruling on an objection. The State objected when the defense elicited testimony from Officer Correa that he may not immediately have reported the child abuse to the Department of Human Services in accordance with the law. The court overruled the objection of the State, but commented that "It seems a little far afield." The trial judge's comment simply

indicated that in making his ruling, he had a question in his mind regarding the relevancy of the testimony, but opted in favor of its admission. His comment did not appear to be directed at the weight of the evidence, but simply to its admissibility. In *Carrasquillo v. State,* 742 S.W.2d 104, 113 (Tex.App.— Fort Worth 1987, no pet.), the trial judge, in overruling an objection as to hearsay, commented, "That appears to be a very small item there." The court there indicated that the content of the testimony itself may not have been so important as to sustain the objection. In this case, as *Carrasquillo,* the comment was not calculated to benefit the State or prejudice Appellant.

■■■ In point 14, Appellant complains of a comment made during a bench conference. The attorneys and the court were discussing the reasons that a police report had been written a year after A.R. was taken, when the court commented to the attorneys, "If they [the defense] want to walk into it … meet it with their chin, go ahead." Defense counsel objected, stating that the comment was loud enough for the jury to hear. The court's comment, however, appears to be nothing more than the court's recognition of the defense's right to cross-examine the officer about the matter. It is not reasonably calculated to benefit the State or prejudice Appellant. *See Becknell,* 720 S.W.2d at 531. Thereafter, the court chastised the defense counsel for making a speech instead of an objection, and stated that the defense counsel was "wholly out of order." Numerous cases have held that chastising attorneys during a trial for unacceptable conduct does not violate the rule against court comments. *See e.g., Betancourt v. State,* 657 S.W.2d 451, 455 (Tex. App.—Corpus Christi 1983, pet. ref'd) (arguing with court); *Liveoak v. State,* 717 S.W.2d 691, 695–96 (Tex.App.—San Antonio 1986), *pet. ref'd,* 741 S.W.2d 451 (Tex.Cr.App.1987) ("get on with the case").

■■■ In point 18, Appellant complains that when the defense asked the trial court for a continuing or running objection to the testimony of Vargas, the court denied the request and erroneously stated in the pres-

ence of the jury, "I can't keep you from continuously objecting. Go ahead and continue your objecting.... I don't know when you quit objecting and when you start waiving." A trial court has the responsibility of conducting an orderly trial and making a record thereof. For a trial judge to require attorneys to object or waive, and to state that he would follow that procedure, is within the parameter of proper comment. It appears to us to be value-neutral. *See McDuffie v. State,* 854 S.W.2d 195 (Tex.App.—Beaumont 1993, pet. ref'd); *see e.g., Rodela v. State,* 829 S.W.2d 845, 850 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd) (comment that "I don't know if you need to do that anymore for appellate purposes" did not benefit State or prejudice defendant).

■ In point 20, Appellant argues that it was error for the court, *sua sponte,* to instruct the jury to disregard certain defense testimony regarding Appellant's cooperation with authorities. During the punishment phase, the court was concerned about previous testimony relative to another court's order in a related civil case. After a bench conference, the court instructed the jury, "Ladies and gentlemen, you will disregard any testimony whatsoever about court orders. No consideration whatever about what was done or not done by reason of court order." Appellant did not object to the court's ruling striking the testimony; therefore, no exclusion of evidence point is before us. The error assigned is that the court's instructions to the jury regarding his ruling was a comment on the evidence. We do not view the court's merely verbalizing to the jury his ruling as being a comment on the weight of the evidence. Once again, this comment appears to be value-neutral. *McDuffie,* 854 S.W.2d at 195; *Carrasquillo,* 742 S.W.2d at 104.

For the above stated reasons, we conclude that the court's comments complained of by Appellant were not reasonably calculated to benefit the State or injure the rights of the defendant. *See Lookingbill,* 855 S.W.2d at 77; *Williams,* 834 S.W.2d at 505. Points of error 12, 13, 14, 18, and 20 are overruled.

## CHARGES ON LESSER-INCLUDED OFFENSES

Appellant asserts in point 21 that the court erred in failing to charge the jury on the lesser-included offense of causing serious bodily injury by recklessness and/or criminal negligence. In point 22, she alleges trial court error in failing to charge the jury on the lesser-included offense of causing bodily injury by recklessness and/or criminal negligence.

■ TEXAS CODE OF CRIMINAL PROCEDURE article 37.09 provides that an offense is a lesser-included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX.CODE CRIM.PROC.ANN., art. 37.09 (Vernon 1992). A defendant charged with an offense that has lesser-included offenses may be found not guilty of the offense charged in the indictment, but guilty of any lesser-included offenses. TEX.CODE CRIM.PROC.ANN. art. 37.08 (Vernon 1992).

■ There is a two-pronged test for determining whether a jury must be charged on a lesser-included offense which has become known as the *"Royster–Aguilar"* test. *Aguilar v. State,* 682 S.W.2d 556 (Tex.Cr. App.1985); *Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981); *Ybarra v. State,* 890 S.W.2d 98, 108 (Tex.App.—San Antonio 1994, pet. denied). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. Second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense. *Ross v.*

*State,* 861 S.W.2d 870, 876 (Tex.Cr.App.1992) (opinion on reh'g); *Jones,* 833 S.W.2d at 127.

Recently, however, the Court of Criminal Appeals has modified the second prong to read: "Second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty he is guilty only of the lesser offense." *Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex. Cr.App.1993), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993) (emphasis in original). In *Rousseau,* the Court stated: "In applying the two-prong test, the trial court should make a determination as to whether the evidence of the lesser offense would be sufficient for a jury rationally to find that the defendant is guilty only of that offense, and not the greater offense." *Id.* at 673.

In determining whether the trial court erred in failing to give a charge on a lesser-included offense, all of the evidence presented by the State and the defendant must be considered. Entitlement to a jury instruction on a lesser-included offense must be made on a case-by-case basis according to the particular facts. *Ybarra,* 890 S.W.2d at 108.

In the instant case, the testimony of Officers Lowndes and Deal, dispatcher Vargas, nurse Helm, pediatrician Rogers, Department of Human Services investigator Kennedy, and close neighbor Albarran shows that A.R. was repeatedly abused, was intentionally starved, was placed outside in a box during cold weather, was tied to the wall all day in a crouched position, and was extremely malnourished. Her body had bruises, cuts, and burns, and she was suffering from dehydration and a urinary tract infection. Further, A.R. weighed only 12.9 pounds. The nurse and the pediatrician were of the opinion that the environment from which A.R. came created a substantial risk of death within a month or two at that current nutritional state. It was undisputed that A.R. was under the care and control of Appellant, her mother. Appellant intentionally took food from A.R., and was well aware of A.R.'s extreme malnourished condition. She intentionally hid A.R. from authorities, and by her own admission, she could "kill her" if she

wanted to, and she "didn't have to feed her or do anything." Based on our review of the record, we do not agree that a jury could have rationally found that if the defendant is guilty, she is guilty *only* of the lesser-included offenses.

The claims made by Appellant in the present case are analogous to those rejected in *Canaday v. State,* 853 S.W.2d 810, 810 (Tex. App.—Beaumont, 1993, no pet.). In *Canaday,* the defendant was charged with and convicted of the offense of injury to a child. The testimony of six witnesses showed that the defendant had inflicted both physical and psychological abuse upon the victim for the last two to three months before she died from head trauma. *Id.* at 812. On appeal, he claimed that the trial court erred by refusing his request for a charge on the lesser-included offense of recklessly or by criminal negligence causing serious bodily injury, and the offenses of causing bodily injury under all other mental states. The court rejected his claims on the basis that the evidence failed on the second prong of the modified *Royster–Aguilar* test. *Id.* The court held that "[based on the evidence], the jury could [not] have rationally found appellant guilty *only* of any of the lesser included offense, *and not the greater offense." Id.* (emphasis in original).

Similarly, in the instant case, the evidence points only to Appellant intentionally or knowingly causing serious bodily injury to A.R. Considering all the evidence in the case, we cannot say that the jury could have rationally found Appellant guilty *only* of any of the lesser-included offenses. Therefore, it was not error for the trial court to refuse Appellant's request to submit any of the lesser-included offense options to the jury. *See Canaday,* 853 S.W.2d at 812. Points of error 21 and 22 are overruled.

## POINTS FOR WHICH NO AUTHORITY PRESENTED

In points 1, 23, and 24, Appellant raises other alleged trial court errors; however, no authority is cited for these arguments. Appellant asserts in her first point that the trial court erred in refusing to allow

the expert witness, Rogers, to answer a question regarding lack of intent of Appellant to deprive A.R. of food and nourishment. The question propounded by her attorney was: "So it would not appear, as regards [A.R.], that anyone had intentionally set out to deprive her of all food and nourishment?" During the bill of exception hearing, Rogers gave his answer as, "Correct." Appellant cites no authority, cases, or statutes in support of her contention.

In point 23, Appellant alleges that the trial court erred in failing to give a limiting instruction in the jury charge regarding its consideration of the testimony of Maria Molina as impeachment evidence, even though the court had already given the instruction during the trial. Again, Appellant cites no authority, cases, or statutes in support of her contentions in this point.

In point 24, Appellant alleges that the trial court erred in, *sua sponte,* instructing the jury not to consider the testimony of Reverend Matia Fuentes during the punishment phase of the trial. The court stated, in striking Fuentes' testimony, that the witness "doesn't know enough about the situation to be helpful to the jury in any manner ... so I can see no relevance to his testimony whatever." Once again, Appellant cites no authority, cases, or statutes for her position.

■ The failure by Appellant to brief these grounds of error or to cite any authority presents nothing for review. *See* TEX. R.APP.P. 74(f); *Bullard v. State,* 891 S.W.2d 14, 15 (Tex.App.—Beaumont 1994, n.p.h.); *Vuong v. State,* 830 S.W.2d 929, 940 (Tex.Cr. App.), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). We, therefore, decline to address these points because they are inadequately briefed and present nothing for review on appeal. Points of error 23 and 24 are overruled.

Finding no reversible error, the judgment of the trial court is affirmed.