# NO. 12-11-00095-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JEFFREY ROSS SEERY,* *APPELLANT* | § | *APPEAL FROM THE 392ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *HENDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Jeffrey Ross Seery appeals his convictions for three counts of sexual assault. Appellant raises six issues on appeal relating to the admissibility of evidence, the search of his cellular telephone, and cumulative error. We affirm.

### BACKGROUND

Appellant was indicted for three counts of sexual assault. The complaining witness was his former stepdaughter, K.B.[1] At the time of trial, K.B. was sixteen years old.

Appellant, his then-wife Mary, and her two daughters, K.B. and S.S., moved to Brownsboro, Texas, in 2009. They lived in an apartment until June 2009 when they moved to Chandler and lived with K.B.'s grandmother (Mary's mother). K.B. was fourteen years old.

Appellant first came into K.B.'s life when she was approximately four years old. He was not close to K.B. when she was a young child. But after the family moved to Brownsboro, Appellant and K.B. decided to "work on" their father-daughter relationship. K.B. testified that

---

[1] For purposes of confidentiality, we use initials or pseudonyms to identify the testifying witnesses.

she and Appellant became closer by sharing secrets and having "PCs" (private conversations) with each other. When they moved to Brownsboro, Appellant became the sole disciplinarian. Mary testified that once this occurred, she "wasn't really allowed to talk to [K.B.]" and felt that she and K.B. were "drifting apart."

As time went on, K.B.'s relationship with Appellant became sexual. Their first sexual contact occurred in the living room of their Brownsboro apartment. K.B. testified that she and Appellant were talking in the living room when K.B. told him that she "didn't want to fight anymore." Appellant told K.B. that he "probably knew how we could fix that," stood in front of K.B., pulled his penis out of his pants, and had her perform oral sex. Appellant had K.B. perform oral sex several times throughout the summer at various places, including her grandmother's house, and in the car after church.

The sexual conduct between Appellant and K.B. quickly escalated to intercourse. K.B. testified that she and Appellant had intercourse in her bedroom at their Brownsboro apartment on two separate occasions. Appellant and K.B. last engaged in intercourse in July 2009 when they were at his girlfriend's house.

K.B. introduced Appellant's girlfriend, "Betty," to him in June 2009 when he was still married to Mary. K.B. introduced them because Appellant was suffering from withdrawals and thought that Betty could help him. Despite his still being married, Appellant began a romantic relationship with Betty, and began living with her. To hide his affair, Appellant told Mary that he was staying at various military bases and that both girls were with him. She was also told that K.B. was periodically helping babysit at Betty's house.

Suspecting an affair, Mary called the number assigned to a "Captain Harris" in K.B.'s cellular phone. Mary learned that "Captain Harris" was Betty, Appellant had not been living at a military base, and contrary to his representations, Appellant was not being deployed overseas in August.[2]

A Henderson County jury convicted Appellant on three counts of sexual assault. The jury assessed punishment at twenty years of imprisonment and a fine of $10,000 on each count. The sentences were ordered to run consecutively.

---

[2] Testimony revealed that Appellant was adamant about his military service and his approaching deployment date, and that several of his friends gave him a "going away" party.

In his first issue, Appellant argues that the trial court misapplied Texas Rule of Evidence 412 and committed reversible error by excluding evidence of K.B.'s prior sexual conduct at trial. Appellant contends that exclusion of this evidence prevented him from presenting his defense. Appellant's defense was that "[K.B.] falsely accused him of sexually assaulting her as retaliation for him punishing her for drinking alcohol, stealing prescription medications, and having sex with two other boys about three weeks prior to her making the allegations."

**Standard of Review**

A trial court has considerable discretion in determining whether to exclude or admit evidence. *See **Montgomery v. State***, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990); ***State v. Dudley***, 223 S.W.3d 717, 724 (Tex. App.—Tyler 2007, no pet.). Absent an abuse of discretion, we will not disturb a trial court's decision to admit or exclude evidence. *See **Martin v. State***, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment. ***Id.***

**Applicable Law**

Evidence of a complaining witness's past sexual behavior, either in the form of specific instances of conduct or reputation or opinion evidence is not admissible in a criminal trial for sexual assault. ***Dudley***, 223 S.W.3d at 723-24. There are, however, exceptions to this rule when the evidence (1) is necessary to rebut or explain scientific or medical evidence offered by the state, (2) is of past sexual behavior with the accused and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior that is the basis of the offense charged, (3) relates to the motive or bias of the alleged victim, (4) is admissible under Rule 609, pertaining to impeachment by evidence of conviction of a crime, or (5) is constitutionally required to be admitted. *See* TEX. R. EVID. 412(b)(2)(A)-(E). But even if the evidence falls under one of these exceptions, its probative value must still outweigh the danger of unfair prejudice. *See* TEX. R. EVID. 412(b)(3); *see also* TEX. R. EVID. 403.

**Discussion**

Appellant argues that evidence of K.B.'s past sexual behavior is admissible under three exceptions to Rule 412 and that the probative value of the evidence outweighs the danger of unfair

3

prejudice.   We will address each of the three exceptions cited by Appellant.

### 1. To Explain Medical Evidence

Defensive evidence that might offer an alternative explanation for the state's medical evidence must directly address and clearly contradict the state's evidence to be admissible under Rule 412(b)(2)(A).   *See* **Todd v. State**, 242 S.W.3d 126, 129 (Tex. App.—Texarkana 2007, pet. ref'd).

In this case, the State offered medical evidence by eliciting testimony from the sexual assault nurse examiner (SANE nurse) who performed K.B.'s exam.   The exam was performed approximately two weeks after K.B. made sexual assault allegations against Appellant.[3]   The nurse testified that she found no signs of physical trauma.   When asked why she would not find any signs of trauma, the nurse explained that once a woman begins her menstrual cycle, she produces estrogen, which allows the hymen to stretch so that it can facilitate penetration without any trauma.   The State then asked, "And had the assaults been going on for some time, would there be a less likely chance for trauma or more likely chance for trauma?"   The nurse answered, "Less likely chance for trauma."

On cross examination, the nurse confirmed that the prior sexual conduct or history of a fifteen year old girl would affect whether she would observe trauma during an exam.   In a hearing outside the presence of the jury, she confirmed that the more times a person has sexual intercourse, the less likely it is that she will see trauma.[4]   Appellant also questioned K.B. outside the presence of the jury about her prior sexual history.   K.B. confirmed that she had engaged in sexual intercourse with two other boys while she was at Betty's house.   Because the SANE nurse testified that the prior sexual history of a fifteen year old girl would affect whether she would observe trauma, Appellant argues that K.B.'s sexual history was necessary to offer another explanation for why the SANE nurse did not see trauma—because K.B. had intercourse with someone other than Appellant.   We construe Appellant's argument as a contention that the State opened the door by asking whether K.B.'s lack of injury would be consistent with ongoing sexual assaults.

---

[3]  At the time of the exam, K.B. was fifteen years old.

[4] This testimony was not presented to the jury, and defense counsel did not request permission from the court to elicit this testimony in the jury's presence.

Otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered "opens the door." *Schutz v. State*, 957 S.W.2d 52, 71 (Tex. Crim. App. 1997). But the party offering the evidence may not stray beyond the scope of the invitation. *Id.* Under the "opened-door doctrine," a defendant cannot intentionally broach a subject and then complain when the subject is subsequently pursued by the state. *Mares v. State*, 52 S.W.3d 886, 890 (Tex. App.—San Antonio 2001, pet. ref'd). This rule applies equally to the state. *See, e.g.*, *Hernandez v. State*, No. 08-99-00039-CR, 2000 WL 1713937, at \*7 (Tex. App.—El Paso, Nov. 16, 2000, no pet.) (not designated for publication) (once state opens door, defense is entitled to rebut state's witness).

We agree that the State opened the door to K.B.'s prior sexual history by asking whether ongoing sexual assaults could explain the nonexistence of trauma in a nonacute exam. But our analysis does not end here. In order for K.B.'s prior sexual history to be admissible, its probative value must outweigh its prejudicial effect. *See* TEX. R. EVID. 412(b)(3); TEX. R. EVID. 403; *see also Allen v. State*, 700 S.W.2d 924, 929 (Tex. Crim. App. 1985) ("[E]ven if the court finds the evidence is material to an issue in the case, its inflammatory or prejudicial nature must not outweigh its probative value."). The burden falls on the proponent of the evidence to show that the probative value of the evidence outweighs its prejudicial effect. *Stephens v. State*, 978 S.W.2d 728, 733 (Tex. App.—Austin 1998, pet. ref'd).

As we stated earlier, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. "Probative value" refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "Unfair prejudice" refers to a tendency to suggest a decision on an improper basis, e.g., evidence may be unfairly prejudicial if it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id.* at 879-80. In light of the underlying policies of Rule 412, the "unfair prejudice" language contemplates prejudice not only to the state, but also to the victim, who will potentially be stigmatized if the defendant is able to introduce evidence of sexual behavior. *See Stephens*, 978 S.W.2d at 733; *see also Chavira v. State*, No. 12-03-00108-CR, 2004 WL 1418390, at \*2 (Tex. App.—Tyler June 23, 2004, no pet.)

5

(mem. op., not designated for publication).

Here, the proposed evidence would have given the jury another explanation for the SANE nurse's findings—that the lack of trauma could have also been due to the fact that K.B. had engaged in sexual intercourse with someone other than Appellant. This evidence, however, could have been introduced without inquiry into K.B.'s prior sexual history. Defense counsel was not denied the opportunity to cross-examine the SANE nurse as to whether a finding of no trauma would be consistent if an individual engages in consensual sexual intercourse.[5] Thus, the probative value of the evidence did not outweigh the prejudicial effect that such testimony would have not only on the State, but also on K.B. Accordingly, we conclude that the trial court's exclusion of K.B.'s prior sexual history with regard to explaining the State's medical evidence was not an abuse of discretion.

### 2. *To Explain Scientific Evidence*

The State's scientific evidence was in the form of DNA evidence obtained from a blood stain found on a mattress.

During her forensic interview, K.B. described an incident in which she and Appellant engaged in sexual intercourse while they were at Betty's home. The incident occurred in Betty and Appellant's bedroom during K.B.'s menstrual cycle. She told the interviewer that she bled through the sheets, leaving a blood stain on Betty's mattress. In order to conceal the stain, Appellant and K.B. flipped the mattress over.

Upon gaining Betty's consent to search the home, investigators found a blood stain on the underside of Betty's mattress that matched K.B.'s description. Law enforcement cut out a large portion of the mattress containing the stain, gathered it as evidence, and sent it to a laboratory for testing. The lab results showed a positive match for K.B.'s DNA, but not Appellant's. A sample of DNA was obtained from K.B.'s boyfriend, but his DNA was excluded as well. The forensic scientist testified that the DNA mixture containing K.B.'s DNA also contained DNA from an "unknown male." But there was not any way of determining how long the "unknown male's" DNA had been on the mattress. The forensic scientist explained that DNA could stay on an item

---

[5] Defense counsel requested that he be permitted to ask the SANE nurse only whether a person's prior sexual history would affect whether she would see trauma during an examination. The trial court allowed this question.

indefinitely if the item was stored at the proper temperature and not washed.

Investigators asked Appellant about the stain found on Betty's mattress. Appellant first told them that he was aware of the stain because he and Betty had intercourse while she was menstruating. But Betty's testimony at trial revealed that when she saw the stain, she knew that the blood was not hers because she had undergone a hysterectomy. She also confirmed that Appellant had mentioned getting a new mattress. Betty testified that she has had her bed "a long time," that it was the same one she had when she was married to her ex-husband, and that she had sexual intercourse with men other than Appellant and her ex-husband in that bed.

Appellant sought to introduce K.B.'s prior sexual history to explain the existence of another male's DNA on Betty's mattress. But there was no evidence that K.B.'s prior sexual conduct with anyone other than Appellant ever occurred on Betty's bed. Furthermore, Betty's testimony suggested that the DNA could have been from one of her prior sexual partners. Accordingly, we conclude that the trial court's exclusion of K.B.'s prior sexual history to explain scientific evidence was not an abuse of discretion.

### 3. *To Show Motive or Bias of Alleged Victim*

Appellant argues that the trial court prevented him from "present[ing] evidence of K.B.'s motive to lie, which included his punishing her just three weeks [before she made the allegations] for having sexual intercourse with other boys." He contends that K.B.'s prior sexual history formed such a vital portion of his case that the exclusion of this evidence precluded him from presenting a defense.

A defendant has the right to confront witnesses by cross-examining them to attack their credibility, or show their bias, self-interest, or motive in testifying. *See Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). Under Rule 412, a defendant is permitted to inquire into an alleged victim's prior sexual history if such evidence relates to the motive or bias of the alleged victim, and the probative value of the evidence outweighs the danger of unfair prejudice. *See* TEX. R. EVID. 412(b)(2)(C), (b)(3); *Chew v. State*, 804 S.W.2d 633, 635 (Tex. App.—San Antonio 1991, pet. ref'd) ("The motives which operate on the mind of a witness while [she] testifies should never be regarded as immaterial or irrelevant.").

Appellant's defensive theory was that K.B. was motivated to fabricate the allegations because Appellant punished her for misbehaving and having sexual intercourse with boys.

7

Appellant was not denied the opportunity to present his fabrication defense. The evidence showed that Appellant initially took over the responsibility of disciplining K.B. because she was sneaking out at night and having boys at the house "constantly." When K.B. moved into Betty's home with Appellant, she continued to have behavioral problems that included "sexting" messages to her boyfriend and other boys, sneaking boys into the house in the middle of the night, stealing alcohol and prescription medication, and "not doing the things she needed to do" at school. Various disciplinary techniques were employed, but were unsuccessful.

K.B.'s behavior became so out of control that Betty and Appellant decided to have K.B. and her friend "fake arrest[ed]." Betty testified that she and Appellant were out of options and did not know what to do to stop K.B.'s misbehavior. They believed the fake arrest would serve as a wake-up call after she sneaked boys into Betty's house who brought stolen property with them. Betty testified that after K.B. was arrested, she returned to her mother "because [K.B.] didn't want to be grounded and [suffer] the consequences of her behavior." Betty testified that the fake arrest occurred three weeks before K.B. made the allegations. Two weeks before K.B.'s allegations, Appellant contacted an attorney in order to obtain full custody of K.B. and S.S.

Under the facts of this case, K.B.'s prior sexual history with her boyfriend and another male would only show that she was sexually active. Appellant's decision to have K.B. "fake arrest[ed]" and alleged desire to have full custody of K.B. could have very well served as a motivating factor for K.B. to fabricate a story against Appellant in order to avoid living with him in the future. But K.B.'s prior sexual history does not tend to establish that K.B. fabricated the story because she was having sexual intercourse with others. *See Franklin v. State*, No. 12-08-00391-CR, 2010 WL 337334, at *5 (Tex. App.—Tyler Jan. 29, 2010, no pet.) (mem. op., not designated for publication) (no error in excluding sexual nature of victim's relationship with boyfriend to establish motive to fabricate when there was evidence that victim and defendant frequently quarreled about her boyfriend who was ten years older than the victim and lived in the apartment rent-free); *Chavira*, 2004 WL 1418390, at *3 (no error in excluding victim's past sexual conduct because it did no more than show that she was sexually active and did not establish she had motive to falsely accuse defendant); *Stephens*, 978 S.W.2d at 735 (holding that appellant failed to demonstrate "definite and logical link" between complainant's sexual behavior and alleged motive).

8

Appellant did not need evidence of K.B.'s prior sexual history to demonstrate K.B.'s motive to fabricate allegations against him. Furthermore, the fact that K.B. had a history of sneaking boys in and out of the house, had taken provocative photographs of herself with her cellular phone, and was punished for having boys spend the night, provided enough evidence for the jury to reasonably infer that K.B. was sexually active and that her sexual conduct was part of the behavior that Appellant and Betty were trying to correct. Thus, the trial court reasonably could have concluded that the probative value of K.B.'s prior sexual history did not outweigh the danger of unfair prejudice    Accordingly, we overrule Appellant's first issue.

**EXTRANEOUS OFFENSES**

In his second issue, Appellant contends that the trial court erred by admitting his military record. The State urges that Appellant's military record was "clearly relevant to show intent, plan, and preparation."

**Applicable Law and Standard of Review**

Generally, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *See* TEX. R. EVID. 404(b). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See id.* The enumerated exceptions of Rule 404(b) are neither mutually exclusive nor collectively exhaustive. *Montgomery*, 810 S.W.2d at 377. Extraneous offense evidence is admissible under both Rules 404(b) and 403 if that evidence is relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character; and the probative value of the evidence is not substantially outweighed by unfair prejudice. *Martin*, 173 S.W.3d at 467. Thus, evidence that is relevant to a noncharacter conformity fact of consequence in the case may be admissible in rebutting a defensive theory. *See Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). When a defendant objects to the admission of extraneous offense evidence, the state must persuade the trial court that the extraneous offense evidence is being offered for a purpose other than character conformity, and that this other purpose tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Rankin v. State*, 974 S.W.2d 707, 719 (Tex. Crim. App. 1998) (op. on

9

reh'g); *Crutchfield v. State*, No. 12-09-00348-CR, 2011 WL 2638402, at \*4 (Tex. App.—Tyler June 30, 2011, pet. ref'd) (mem. op., not designated for publication) (proponent must show extraneous offense has relevance apart from showing character).  We review the trial court's decision for abuse of discretion.  *See **Montgomery***, 810 S.W.2d at 379.

**Discussion**

At the end of its case in chief, the State introduced Exhibit 44—a certified copy of Appellant's military record.  Appellant objected to the admission of this evidence, contending that the "bad acts" described as the reason for Appellant's discharge from the military should not be admissible.[6]  Defense counsel argued that if the reason for Appellant's discharge was redacted from the records, he would not object to the admissibility of the records, other than his running objection to the relevancy of Appellant's military involvement or lack thereof.  The portions of the exhibit relating to extraneous offenses show that in March 2001, Appellant was charged with "escape," that he was discharged from the military for "misconduct," and that he was subjected to a court martial in November of 1990 for charges involving "failure to repair," "leaving barracks," "breaking quarters," "failure to secure," and "failure to pay."

We agree with Appellant that the aforementioned portions of Exhibit 44 were not relevant to a fact of consequence in this case.  Here, the State had to prove that Appellant penetrated K.B.'s mouth with his sexual organ on two occasions and penetrated K.B.'s sexual organ with his sexual organ on one occasion.  The fact that Appellant was charged with "escape" and had been discharged from the military for misconduct does not make it more or less likely that Appellant committed the offenses charged.  *See* TEX. R. EVID. 401.  Furthermore, Appellant's theory of defense was that K.B. fabricated the allegations against Appellant in retaliation for disciplining her.  The extraneous offenses show nothing that would rebut Appellant's theory of defense.  Thus, the extraneous offenses were irrelevant, and the trial court abused its discretion by overruling Appellant's objection.

**Harm Analysis**

A violation of the evidentiary rules that results in the erroneous admission of evidence is nonconstitutional error.  *See **Kirby v. State***, 208 S.W.3d 568, 574 (Tex. App.—Austin 2006, no

---

[6] Appellant was granted a running objection throughout trial regarding any testimony concerning his military background.   We address the relevancy of Appellant's military background in a subsequent section of this opinion.

10

pet.); *see also **Johnson v. State***, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Nonconstitutional error is reversible only if it affects the substantial rights of the accused. TEX. R. APP. P. 44.2(b); ***Johnson v. State***, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). We will not overturn a criminal conviction if, after examining the record as a whole, there is a fair assurance that the error did not influence the jury, or influenced the jury only slightly. ***Barshaw v. State***, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). Our focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict. *Id.* at 93-94. If there is grave doubt that the result of the trial was free from the substantial effect of the error, the conviction must be reversed. *Id.* at 94. "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

In determining whether the error affected the substantial rights of the defendant, we consider everything in the record, including the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instruction, the state's theory, the defensive theories, closing arguments, voir dire, and whether the state emphasized the error. *Id.*

In this case, the State had to prove beyond a reasonable doubt that Appellant intentionally and knowingly caused the penetration of the mouth of K.B., a child younger than seventeen years of age and not his spouse, by Appellant's sexual organ on two separate occasions. *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(B) (West 2011). The State also had to prove beyond a reasonable doubt that Appellant intentionally and knowingly caused the penetration of the sexual organ of K.B., a child younger than seventeen years of age and not his spouse, by Appellant's sexual organ. *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A) (West 2011).

The evidence supporting Appellant's conviction included (1) K.B.'s testimony that Appellant sexually assaulted her, (2) Appellant's initial explanation that the blood stain on Betty's mattress came from Betty when they had intercourse while she was menstruating, (3) DNA evidence showing that the blood was K.B.'s, (4) Betty's testimony that she knew the blood was not hers because she had undergone a hysterectomy, (5) testimony from K.B.'s boyfriend that Appellant referred to K.B. as "sexy," (6) testimony from K.B.'s friend that Appellant groped K.B.'s breast, and (7) Appellant's admission to engaging in "inappropriate" behavior with K.B.

11

that included sending inappropriate text messages and using "flirty type language."

Other evidence showed that Appellant was untruthful about his military service. In order to explain his and the girls' absence from their home during the summer of 2009, Appellant told his wife that he was staying at various military bases and that K.B. and S.S. were staying with "Captain Harris." They were actually staying at Betty's home.[7] Appellant also told his wife and others that he was to be deployed overseas, prompting several of his friends to have a going away party in his honor. Appellant was never deployed.

Betty testified that she did not know how long Appellant had been out of the military. Appellant regularly wore fatigues and occasionally slept in a sleeping bag on top of the mattress. On the day of his arrest, Appellant told investigators that he worked for Homeland Security and was "contracted" through a friend. But Appellant listed "U.S. Army, Fort Bragg" as his employer on his book-in sheet at the jail.

Appellant's military record only confirmed what the jury already knew before it was entered into evidence—that Appellant lied about his military service. Exhibit 44 was forty pages long, and consisted mostly of documents from 1989. Four of the forty pages related to extraneous conduct.

Upon Exhibit 44's admission, a limiting instruction was not requested or given to the jury. The court's charge instructed the jury not to consider any testimony regarding extraneous offenses unless they found that Appellant committed such offenses beyond a reasonable doubt. The jury was further instructed that it could "only consider the same in determining the intent of the defendant, if any, in connection with the offense, if any . . . and for no other purpose." We presume the jury followed the instructions in this case, and Appellant has not pointed to any evidence to rebut this presumption. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (appellant must rebut presumption that jury follows court's instructions by pointing to evidence that jury failed to follow court's instructions); *see also Torres v. State*, No. 12-11-00222-CR, 2012 WL 3201920, at *5 (Tex. App.—Tyler Aug. 8, 2012, no pet.) (mem. op., not designated for publication).

The State's theory for Exhibit 44's admissibility in its entirety was based on the mistaken

---

[7] Appellant's ex-wife testified that when she dialed the "Captain Harris" number contained in K.B.'s cellular phone, Betty answered.

belief that the extraneous offenses contained in Appellant's military record related to a fact of consequence to the case. As we have already stated, this was incorrect because the extraneous offenses did nothing to make Appellant's commission of the offenses more or less likely, and they did not rebut Appellant's theory of defense—that K.B. fabricated the allegations in retaliation for being punished.

In its closing argument, the State suggested that the jury "take a look at State's Exhibit 44" to emphasize the fact that Appellant was not in the military during the summer of 2009 when he claimed to be at various military bases and about to be deployed. The State never mentioned the extraneous offenses contained in Appellant's military record. Instead, the State emphasized Appellant's statements during his recorded interview with law enforcement that he "never" lies, summarized witness testimony, and argued why K.B.'s testimony should be believed.

In the defense's closing argument, trial counsel quickly downplayed the fact that Appellant embellished his military service and reiterated that K.B. was lying about the sexual assault allegations. Trial counsel pointed out conflicts in the evidence and argued that K.B.'s story did not make sense.

The extraneous offense evidence contained in State's Exhibit 44 was never mentioned during either the State's or Appellant's voir dire. Other than the State's reference to Exhibit 44 during its closing argument, there was no emphasis on the extraneous offenses contained in Appellant's military record.

Having reviewed the entire record, we cannot conclude that the extraneous offenses contained in Exhibit 44 had a substantial effect or influence on the jury's verdict. *Barshaw*, 342 S.W.3d at 93-94. Appellant's own statements, when considered with K.B.'s testimony and the physical evidence presented at trial, provided sufficient evidence for the jury to convict Appellant on all three counts in the indictment. Therefore, we conclude that the trial court's error did not affect Appellant's substantial rights. TEX. R. APP. P. 44.2(b). Accordingly, we overrule Appellant's second issue.

### SAME TRANSACTION CONTEXTUAL EVIDENCE

In his third issue, Appellant contends that the trial court committed reversible error by admitting evidence that Appellant lied about his military service. Appellant contends that the lies

about his military service were not a fact of consequence to the case, and were thus, irrelevant. Appellant also contends that his lies concerning his military service constituted inadmissible character evidence because Appellant never testified and did not place his character for truthfulness at issue.

**Applicable Law and Standard of Review**

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Evidence that is not relevant is not admissible. TEX. R. EVID. 402. An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging instrument but was shown to have been committed by the accused. *Hernandez v. State*, 817 S.W.2d 744, 746 (Tex. App.—Houston [1st Dist.] 1991, no pet.) Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. *See* TEX. R. EVID. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). But it may be admissible when it has relevance apart from character conformity, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or as "same[]transaction contextual evidence." *See* TEX. R. EVID. 404(b); *Devoe*, 354 S.W.3d at 469. The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Id.* Thus, same transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence, and is admissible "only to the extent that it is necessary to the jury's understanding of the offense." *Id.*

Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. *Id.* Generally, the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, so long as it sets the stage for the jury's comprehension of the whole criminal transaction. *Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed for abuse of discretion. *Devoe*, 354 S.W.3d at 469.

**Discussion**

The State introduced evidence that throughout his marriage to Mary, Appellant led her to

14

believe that everything he did was related to his military service. Mary testified that the family moved out of their Brownsboro apartment in June 2009 because Appellant told her that they would soon have to move to Montana. She testified that during the summer of 2009, Appellant, K.B., and S.S. rarely stayed with her at her mother's house. Mary testified that Appellant told her that he was staying at a post in "Fort Polk, Fort Hood, something like that" and that he was taking the girls back and forth from the military bases. During this time, she believed that when K.B. was not at the military bases, it was because she was babysitting at Betty's house.

Appellant also told Mary that he was attending meetings with "Sergeant Sear" and "Captain Harris" in Henderson County. Mary testified that Captain Harris was one of the individuals with whom Appellant let K.B. stay.[8] Appellant also told Mary that he was to be deployed overseas on August 15, 2009. By August 15, 2009, Appellant was living with Betty.

Testimony revealed that during the summer of 2009, Appellant was not traveling to various military bases, and neither was K.B. K.B. testified that, during this summer, she wanted to be "closer" to Appellant, and felt like they were "actually" getting to that point when they were living at Betty's house. Appellant maintained his military façade upon his arrest and even while incarcerated.

Appellant's fictitious military involvement and explanations to his wife about living at various military posts set forth the necessary facts to explain to the jury how Appellant isolated K.B. from her mother during the period of abuse that began in February and continued until September 2009. Without Appellant's stories of military service, K.B.'s testimony about the abuse would make little or no sense. *See Devoe*, 354 S.W.3d at 469. Accordingly, we conclude that Appellant's misrepresentations regarding his military involvement were relevant to explain the surrounding facts and circumstances of the offense. *See id.*

Appellant argues that his military background and misrepresentations constituted inadmissible character evidence because Appellant never testified and thus, never placed his character for truthfulness in issue. But Appellant's representations served as the backdrop that facilitated his sexual relationship with K.B. The State emphasized Appellant's emphatic statements in his recorded interviews that he never lies. When the State offered the recordings of

---

[8] As we have stated previously in this opinion, Captain Harris did not exist, K.B. never stayed at a military base, and when Mary called the number identified as "Captain Harris" on K.B.'s cellular phone, Betty answered.

15

each interview, Appellant responded by stating, "No objection." *See* ***Wilson v. State***, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (to preserve error for appellate review, complaining party must make timely, specific objection and obtain ruling). Thus, it was not error for the State to compare the circumstances under which he was able to isolate K.B. from her mother to his voluntary statements that he never lies. Accordingly, we overrule Appellant's third issue.

In his fourth issue, Appellant contends that the trial court committed reversible error by admitting Appellant's cellular phone and its contents into evidence. Appellant argues that the evidence was obtained in violation of the Fourth Amendment and was thus, inadmissible.

**Standard of Review**

Whether a specific search or seizure was reasonable is a mixed question of law and fact. ***St. George v. State***, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We review the trial court's application of law to the facts de novo, but will defer to the trial court on determinations of credibility and historical fact. ***Hubert v. State***, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). We review the issue of whether a third party had actual authority to consent to a search of another's property and whether an officer was reasonable in finding that a third party had apparent authority to consent de novo because these are mixed questions of law and fact. ***Id***. at 559-60. When the trial court does not enter findings of fact, we view the evidence in the light most favorable to the trial court's rulings and assume that the trial court resolved any issues of historical fact or credibility consistently with its ultimate ruling. ***Id***. at 560.

**Applicable Law**

The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The ultimate touchstone of the Fourth Amendment is "reasonableness." *See* ***Kentucky v. King***, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011). The boundaries of

reasonableness have been examined in a variety of contexts, and the general rule is that a search conducted without a warrant is unreasonable. *See Hubert*, 312 S.W.3d at 560. But as with any rule, the courts have recognized several exceptions to the warrant requirement. Among those exceptions is consent. *See id.*; *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).

Consent need not be given solely by the accused to be valid. *See generally United States v. Matlock*, 415 U.S. 164, 170, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242 (1974) (consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared). If the state seeks to justify a warrantless search by proof of consent, it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.*, 415 U.S. at 171, 94 S. Ct. at 993. In order for a third party to validly consent to a search, that person must have equal control and equal use of the property searched. *Welch v. State*, 93 S.W.3d 50, 52-53 (Tex. Crim. App. 2002). Although property interests are relevant to this determination, the commonality of authority to consent is not determined solely by the law of property. *Hubert*, 312 S.W.3d at 560. "In determining whether a third party may give consent to a search, [the] focus is not on a third party's *actual* use of the premises searched." *Balentine v. State*, 71 S.W.3d 763, 773 (Tex. Crim. App. 2002). Instead, the focus is "whether the third party had the *authority* to use the premises." *Id.*; *see also Hubert*, 312 S.W.3d at 560-61 ("[C]ommon authority is shown by mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right. . . ."). Thus, when a defendant shares property or premises with another, he assumes the risk that the other party might permit the search of that property, and may not complain of that search under the Fourth Amendment. *See id.* at 561.

**Discussion**

In this case, the investigating officer testified that Appellant was arrested at Betty's house for an outstanding warrant. When the officers arrived, Betty consented to a search of her home. Law enforcement searched Betty's home for evidence corroborating information they obtained from K.B.'s forensic interview. Specifically, they were looking for a blood stain on the underside of Betty's mattress and photos of a sexual nature contained in Appellant's cellular phone. The

investigator testified that she learned from the interview that the cellular phone containing the photos was purchased by Betty for Appellant's use.

When Appellant was arrested, he gave his personal belongings to Betty. Among those belongings was the cellular phone. During her conversation with Betty, the investigator asked whether Betty had provided the phone to Appellant. Betty confirmed that she purchased the phone for Appellant and was financially responsible for it. Upon asking whether she could look at the contents of Appellant's cellular phone, Betty gave the phone to the investigator.

Betty had common authority over the cellular phone that Appellant had in his possession because she purchased the phone and maintained financial responsibility for it on Appellant's behalf. We acknowledge Betty's testimony that she did not use Appellant's phone, but actual use is not the controlling factor. *See Balentine*, 71 S.W.3d at 773. Because Betty purchased the phone and paid for its service, she had actual authority over the phone, and law enforcement was aware of this information prior to their search of the phone's contents. Appellant had no proprietary interest in the cellular phone and had no possessory right to the phone "other than by the grace of" his girlfriend. *See Hubert*, 312 S.W.3d at 564. Appellant assumed the risk that his girlfriend might permit the search of his phone upon being asked. *See id.* Furthermore, because Appellant requested to give his personal belongings to his girlfriend upon his arrest, her status also rose as one with access and control over the cellular phone. Once she was given the phone, Appellant's girlfriend was able to use the phone, freely examine its contents, and allow someone else to do the same, including law enforcement. *See Welch*, 93 S.W.3d at 53 (holding that defendant assumed risk that police would search truck when given permission to release truck to the passenger upon his arrest). Accordingly, Appellant assumed the risk that his girlfriend would permit the inspection of the phone. *See id.* Thus, the trial court did not err in admitting the cellular phone and its contents into evidence at trial. We overrule Appellant's fourth error.

## INADMISSIBLE HEARSAY

In his fifth issue, Appellant contends that the trial court committed reversible error by admitting hearsay statements of the alleged victim. The State argues that the statements were admissible as excited utterances.

18

**Applicable Law and Standard of Review**

The Texas Rules of Evidence permit the admission of hearsay if it qualifies as an "excited utterance." *See* TEX. R. EVID. 803(2). An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* This exception is based on the assumption that at the time the declarant makes the statement, she is not capable of the kind of reflection to enable her to fabricate information. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005).

In applying the excited utterance exception, (1) the "exciting event" should be startling enough to evoke a truly spontaneous reaction from the declarant, (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication, and (3) the resulting statement should be sufficiently "related to" the startling event, to ensure the reliability and trustworthiness of that statement. *McCarty v. State*, 257 S.W.3d 238, 241-42 (Tex. Crim. App. 2008). The court may also consider the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving. *Apolinar*, 155 S.W.3d at 187.

A statement that is simply a narrative of past events or acts, as distinguished from a spontaneous utterance, does not qualify as an excited utterance, regardless of how soon after the event it is made. *Glover v. State*, 102 S.W.3d 754, 764 (Tex. App.—Texarkana 2002, pet. ref'd). We review a trial court's evidentiary rulings for abuse of discretion. *See Montgomery*, 810 S.W.2d at 379.

**Discussion**

Here, K.B.'s mother testified that the night before K.B. told her of the assault, K.B. had overheard Appellant refer to her as a "whore" and "pathological liar." Mary spoke with Appellant the next morning, and K.B. overheard him tell Mary that K.B. was a "liar" and that she "shouldn't listen to anything [K.B.] said." After Mary talked to Appellant, she overheard K.B. crying while speaking to her boyfriend on the telephone. When Mary spoke to K.B.'s boyfriend, he told her something that "caused [her] concern."

Mary testified that she was sitting across from K.B. as K.B. ended her conversation with her boyfriend. As soon as Mary asked, "is there something you need to tell me," K.B. fell to the floor crying and begged Mary not to hate her or think she was disgusting. Mary testified that she

19

had never seen K.B. "like this" before. Mary continued to question K.B. about why she was crying because "it was something we had to tell the police." K.B. eventually told her mother that she and Appellant had engaged in sexual intercourse and oral sex on multiple occasions and that she wanted to tell the police. When asked whether K.B. "blurt[ed] this out," Mary answered by stating that she "kept telling [K.B.] I needed to know. That I needed to know details because it was something we had to tell the police."

There is no question that K.B. was emotional when she told her mother about the assaults. K.B.'s statements, however, were not made "suddenly" or "immediately" after the startling event, which we assume, for purposes of analysis, was when K.B. overheard Appellant refer to her as a "liar" and a "whore." She made the statements after she spoke with her boyfriend who encouraged K.B. to talk to her mother. K.B. did not "blurt out" the statements and prefaced them by begging Mary not to hate her or think she was disgusting. Lastly, K.B. was almost fifteen years old when she told her mother that the sexual assaults had occurred and that she wanted to tell the police. These circumstances surrounding K.B.'s statements weigh against the spontaneity requirement for the excited utterance exception. *See Apolinar*, 155 S.W.3d at 186 (excited utterance based on assumption that at time of statement, declarant is not capable of kind of reflection that would enable her to fabricate information).

Although statements made in response to questioning are not necessarily inadmissible, we conclude that K.B.'s responses to her mother's questioning qualified as a narrative of past events, not an excited utterance or "spontaneous statement." *See Hughes v. State*, 128 S.W.3d 247, 253 (Tex. App.—Tyler 2003, pet. ref'd) (questions calculated to elicit information about past events suggests lack of spontaneity element of excited utterance exception); *Glover*, 102 S.W.3d at 764. K.B.'s pleas for mercy, her delay, her age, and her confirmation that she wanted to tell police support our conclusion that at the time of the statements, K.B. was "able and likely to reflect before answering" her mother's questions. *Hughes*, 128 S.W.3d at 254. Thus, K.B.'s statements did not qualify as an excited utterance and therefore do not fall within this exception to the hearsay rule. Accordingly, we conclude that the trial court erred in admitting K.B.'s statements through her mother's testimony.

Improper admission of hearsay evidence is nonconstitutional error. *Id*. at 255. But it is well settled that the admission of hearsay evidence does not constitute reversible error if the same

20

facts were proven by evidence introduced without objection. ***Thomas v. State***, 621 S.W.2d 158, 164 (Tex. Crim. App. 1981) (op. on reh'g); ***Rosales v. State***, 932 S.W.2d 530, 536 (Tex. App.—Tyler 1995, pet. ref'd). Here, the State introduced evidence from the SANE nurse who examined K.B. after she made the allegations. Although Appellant objected to the relevancy of the SANE nurse's testimony, he did not offer any other objection when the SANE nurse testified about the history of the sexual relationship between K.B. and Appellant. Furthermore, K.B. testified about the sexual assaults during trial. Thus, we conclude that the trial court's error in admitting the testimony was harmless. *See* ***Thomas***, 621 S.W.2d at 164. Accordingly, we overrule Appellant's fifth issue.

## CUMULATIVE ERROR

In his sixth issue, Appellant contends that he was denied the right to due process and a fair trial by the cumulation of the trial court's errors.

The cumulative error doctrine provides relief only when constitutional errors so fatally infect the trial that they violated the trial's fundamental fairness. ***United States v. Bell***, 367 F.3d 452, 471 (5th Cir. 2004); ***Estrada v. State***, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (two or more errors that may have occurred during guilt-innocence phase of trial does not necessarily render trial fundamentally unfair). We have reviewed all of Appellant's issues. We identified two instances of error—admission of Appellant's military record and K.B.'s hearsay statements to her mother—but both errors were nonconstitutional and harmless. The combined effect of the errors did not create a fundamentally unfair trial. Appellant's military record was not introduced until the end of the State's case in chief. The State made only general references to his military record and did not emphasize the extraneous offenses contained therein. Furthermore, evidence explaining Appellant's assaults was admitted in additional forms other than hearsay—statements made for purposes of medical treatment and K.B.'s testimony. Thus, the trial court's errors did not so fatally infect the trial that they violated Appellant's right to a fair trial. *See* ***Estrada***, 313 S.W.3d at 311. Accordingly, we overrule Appellant's sixth issue.

## DISPOSITION

Having overruled all of Appellant's six issues, we ***affirm*** the judgment of the trial court.

21

**BRIAN HOYLE**
Justice

Opinions delivered February 21, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)

22



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

**FEBRUARY 21, 2013**

**NO. 12-11-00095-CR**

**JEFFREY ROSS SEERY,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 392nd Judicial District Court
of Henderson County, Texas. (Tr.Ct.No. B-17,623)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*