

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00036-CR

JEFFERY BARREN MCKINLEY
A/K/A JEFFERY B. MCKINLEY

APPELLANT

V.

THE STATE OF TEXAS

STATE

----------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1271870D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

A jury convicted Appellant Jeffery Barren McKinley a/k/a Jeffery B. McKinley of sexual assault of a child under age seventeen and assessed his punishment at eight years' confinement. *See* Tex. Penal Code Ann. § 22.011(a)(2)(C) (West 2011). The trial court sentenced him accordingly. In

---

[1]*See* Tex. R. App. P. 47.4.

two points, McKinley complains of the sufficiency of the evidence to support his conviction and the trial court's denial of his challenge for cause on prospective juror number 28. We will affirm.

## II. FACTUAL BACKGROUND

### A. The Victim's Testimony

In August 2011, Allison Downs[2] was living with her mother in Bedford at the Gentry's Walk Apartments. She had recently returned to Bedford after spending seven months at a juvenile facility in San Antonio. She was on probation in the fall of 2011 and attended an alternative school.

Allison first saw McKinley when her mentor took her to Stroud's Fitness in September 2011 to check out the activity schedule. Allison noticed McKinley, and he noticed her; they did not, however, have a conversation that day.

The second time that Allison saw McKinley was when she was at Stroud's with her friend Nia. Allison saw McKinley leaning on a counter, and they stared at each other. Allison noticed that McKinley had a badge with "Jeff M." on it and concluded that he worked at Stroud's. McKinley came over and struck up a conversation with Allison. McKinley ultimately asked Allison for her phone number and gave her his phone number. The two began texting frequently, but it was not flirtatious.

---

[2]This pseudonym is used throughout the parties' briefs and will be used in this opinion to identify the victim. *See* 2nd Tex. App. (Fort Worth) Loc. R. 7 (requiring parties to use aliases in documents filed with the court if the court determines that a person's identity should be protected).

The next time that Allison saw McKinley was five to seven days later when she was leaving her apartment to go to her cousin's apartment to babysit. McKinley was in a gray Chrysler car driving towards the front entryway of the apartment complex.[3] McKinley stopped and honked the horn. Allison did not know that it was McKinley until he rolled down the window and she was able to see him. They realized during this meeting that they lived at the same apartment complex. While Allison was babysitting, she texted McKinley. He asked when he could see her, and the two met later that evening by the pool at their apartment complex.[4] McKinley complimented Allison, saying that she was pretty and that she had a nice shape and size. They talked about their birthdays; Allison told McKinley that her birthday had just passed and that she had turned fifteen. McKinley told her that his birthday was in November and that he was twenty-six, but he also gave two other ages, including that he was nineteen. When Allison pointed out that he had given her different ages, he said, "Plausible deniability." Allison thought that McKinley was older than the ages he gave because his conversation was mature; he talked about work and family, not

---

[3]In the written statement that she gave to the police, Allison said that this was when she met McKinley for the first time. Allison explained during cross-examination that she had started her statement at that point in her story but that she had testified truthfully about her previous meetings with McKinley.

[4]During her direct examination, Allison testified that she met McKinley at the pool after returning from babysitting at her cousin's. On cross-examination, Allison testified that she met McKinley at the pool a few days after meeting him in the parking lot.

school or hanging out.[5]  McKinley told Allison that he was a personal trainer and that he helped people get gym memberships.  McKinley also told Allison that he had twin boys who lived in Kentucky with their mom.  Their talk at the pool lasted for ten minutes, and when they were leaving, McKinley kissed Allison on the lips.  After the kiss, he grabbed her waist and told her that she had pretty pink lips and a pretty smile.  McKinley said that he would text Allison later, and then she went home.

McKinley began texting Allison every morning at 5:00 or 6:00 a.m. before she had awakened for school.  Allison testified that whenever she called McKinley's phone number, which she had stored in her phone under "Consultants S," McKinley always answered; there was no indication that the number she used to contact him, which ended in 3760, was not his phone number.  Allison testified that she used the tag line "Baby" or "Peaches Baby" in her texts to McKinley and that he used the tag line "S.I.G.," but Allison never asked what that stood for.  Allison sometimes used the nickname "Daddy" for McKinley; he referred to Allison using the nicknames "Boo," "Princess," and "Gorgeous."

One morning before school in mid-September, McKinley texted Allison, "Come over.  I'll fix you breakfast.  We can chill."  Allison told her mother that she was going to school, but she went to McKinley's apartment for the first time.

---

[5]Allison testified that McKinley did not tell her that he was thirty-six until later.

4

They talked and watched a movie. While they were watching a movie, McKinley leaned over and started kissing her and touching her on various parts of her body. When McKinley took off his clothes, Allison saw that he had an "A" tattooed on his chest.[6] Allison testified that McKinley's penis contacted her sexual organ. They had sex two times that morning. Allison stayed at McKinley's apartment until the school day was over.

From that day in mid-September through the end of October, Allison went over to McKinley's apartment "almost every single day" and had sex with McKinley approximately fifty times. Sometimes McKinley picked up Allison at a meeting point after school released at 2:45 p.m., they had sex, and she left his apartment about 3:30 or 4:00 p.m. But the normal routine was that she arrived at McKinley's apartment around 7:15 a.m. and stayed until 9:00 a.m., and then McKinley drove her to school in the gray Chrysler 300.[7]

One day when Allison skipped school to go to McKinley's apartment, her probation officer went to the school to see her. When Allison's probation officer learned that Allison was not at school, the probation officer called Allison's

---

[6]McKinley's fiancée also testified that McKinley had a tattoo of an "A" on his chest.

[7]On one occasion, Allison noticed lip gloss in the car and asked McKinley about it. He told her that the car belonged to a girl named Amanda, whom Allison did not know, and that the only reason he had anything to do with Amanda was because they were sharing the car. Allison had also seen women's hair supplies and feminine hygiene products in the cabinet under the sink in McKinley's apartment, but she never told him that she had seen them.

mother. Allison's mother texted Allison, asking where she was; Allison did not text her back. Allison's mother ultimately called McKinley, who was lying on the bed after having had sex with Allison. Allison told McKinley not to answer, but he answered the call and turned on the speaker. McKinley told Allison's mother that she may have the wrong number and that he was not who she thought he was. Allison's mother screamed through the phone, "Well, you sound like a grown man and my daughter is 15 years old and you have no business associating with her so I don't know why your number is in her phone." McKinley told her that he was hanging up, and the conversation ended. Allison testified that she was pretty freaked out but that McKinley was not. She said, "He just looked at me and he kind of smirked[,] and he was like, '[W]ow[.]'" He repeated that she was fifteen[8] and said that her age turned him on and that he wanted sex. They had sex, and she left McKinley's apartment around 10:00 or 11:00 p.m.

When Allison arrived at her house, her mother, her sisters, most of her family, and her counselor were there. They confronted Allison about where she had been and what she had been doing. Allison testified that she knew what she had been doing was wrong because McKinley was older than her and they

---

[8]Allison confirmed that she had told him that she was fifteen during their meeting at the pool.

6

"weren't supposed to be doing what [they] were doing with each other." She did not, however, end her relationship with McKinley; she continued to text him.[9]

Toward the end of their relationship, McKinley started talking to Allison about modeling and told her that prostitution could pay for modeling school. Allison testified that McKinley set up three dates for her to go on, but they never actually went through.[10]

On October 28, 2011, Allison was arrested at school and was taken to juvenile detention because she had violated her juvenile probation by truancy. While Allison was in detention, some police officers came to see her to talk to her about what went on with McKinley. Allison initially refused to talk to them because she did not want to get McKinley in trouble. The officers told her that her mother had retrieved Allison's phone, had gone through the pictures and

---

[9]One of the text messages retrieved from Allison's phone and that was sent from McKinley's phone number was dated October 27, 2011, at 14:15:55 and stated, "I wanna t[----] u. S.I.G." At 14:18, a text from McKinley's phone number was sent to Allison's phone number and stated, "I m ready too babe. S.I.G." At 14:19:37, Allison texted McKinley, "Okay. Well, I'll be waiting daddy," with the signature line "Mrs. Peaches Baby." On October 28, 2011, at 9:21 a.m., a text was sent from McKinley's phone number to Allison's phone number and stated, "U left your nighty here red n blk lol. Middle of the floor lol. I'll get it to u when we hook up tonight to deposit that money ok princess. Ha smells gud S.I.G."

[10]A text message that was retrieved from Allison's phone and was sent from McKinley's phone number states, "Someone wants to pay for sum Mrs. Peaches Baby" and gives an address. Allison responded by asking if she could use McKinley's apartment. McKinley asked for a time and told her to throw a small blanket over the place where she was going to have sex with the man who was willing to pay.

7

texts messages, and was concerned that Allison had been "messing with an older man." At that point, Allison decided to speak to the officers. Allison also gave a written statement[11] and initially agreed to go to the hospital, but once she arrived, she declined a sexual assault exam.

## B. McKinley's Fiancée's Testimony

In June 2011, McKinley was engaged to Amanda, and they lived together at the Gentry's Walk Apartments.[12] During that summer, Amanda began having doubts about whether she would marry McKinley. By September 2011, she was fighting a lot with McKinley. To cool off, she would leave and go to her mother's house. The longest that she stayed at her mother's house was two or three days. But even when she did not spend the night at McKinley's apartment during September and October 2011, Amanda would drive to his apartment a little before 8:00 a.m. every day to help him look for a job and to make sure that he had food because he was not working.[13] She would get ready for work at the

---

[11]In the written statement she gave to the police, Allison described in detail the inside of McKinley's efficiency apartment. Officer Nunez, who was present when Detective Ripley executed the search warrant at McKinley's apartment, testified that from Allison's description of the apartment and the furnishings, it was pretty obvious that she was familiar with the apartment.

[12]Amanda testified that McKinley's apartment was her residence from mid-September to the end of October 2011, but she did not co-sign on the lease because she did not want her credit affected if the bills were not paid.

[13]McKinley never told Amanda that he had a job at Stroud's, and she did not believe that he ever had a job there because she never saw a name tag or a uniform showing that he worked at Stroud's. Amanda testified that McKinley did

8

apartment, and then he would drive her to her job. They usually would leave the apartment around 8 a.m., and she would arrive at work at 8:15 a.m., except for Wednesdays and Thursdays when they would leave the apartment at 9:30 a.m. because she did not have to be at work until 10 a.m. Amanda owned her own car, a silver Chrysler 300, which she allowed McKinley to use during the day while she was at work. McKinley met Amanda for lunch every day and then picked her up from work at the end of her work day.

Amanda testified that McKinley had a trip planned at the end of October to go to Kentucky to see his daughter for her birthday.[14] Amanda decided to retrieve her belongings while McKinley was out of town. Amanda went to McKinley's apartment on October 31 and saw that "things were kind of thrown around the apartment," and she found documentation showing that a warrant had been served. Amanda got in touch with McKinley while she was still in the apartment and told him about the warrant; he said that he had no idea why the police would have been inside his apartment. Amanda also asked McKinley about a solid red item of lingerie, which she found in the apartment and did not belong to her; he said that one of the guys had brought it by to show off to the rest of the guys and had left it. When she was leaving, Amanda was pulled over by the police in the parking lot. One of the officers, Sergeant Stillman, told

not have consistent employment, but occasionally he helped a friend who owned a mattress moving company.

[14]Amanda testified that McKinley has twin sons and one daughter.

9

Amanda to contact McKinley immediately and to tell him to call Sergeant Stillman or Detective Ripley. Amanda contacted McKinley and gave him the officers' phone numbers.

### C. McKinley's Contact with Police and Arrest

Detective Ripley received a voicemail message on his business work phone from McKinley on November 1, 2011. Detective Ripley saved the message to his pocket recorder, and the recording was admitted into evidence.[15] McKinley stated that he was in Kentucky and that he would return on Wednesday. McKinley said that he had a new phone, that he had been receiving some crazy text messages, and that he hoped the case had nothing to do with that. McKinley asked Detective Ripley to call him back at his number ending in 3760, but Detective Ripley was not able to get in touch with McKinley. Detective Ripley was informed on February 21, 2012, that McKinley had been arrested in Toledo, Ohio, on the warrant from Bedford.

### III. SUFFICIENCY OF THE EVIDENCE

In his first point, McKinley argues that insufficient evidence exists to support his conviction for the offense of sexual assault of a child under seventeen years of age because Allison was not credible, Allison's testimony was inconsistent regarding when McKinley and Allison were alone for the first time, there was a discrepancy between the timetable Allison gave of her morning

---

[15]Amanda recognized McKinley's voice on the recording of the message.

visits to McKinley's apartment and the timetable his fiancée gave regarding when she left his apartment each morning, and there was no evidence that McKinley was the actual sender and recipient of the texts and calls to and from Allison.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Winfrey*, 393 S.W.3d at 768. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences

11

in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Temple*, 390 S.W.3d at 360.

A person commits the offense of sexual assault of a child younger than seventeen years of age if the person intentionally or knowingly causes the sexual organ of a child to contact or penetrate the sexual organ of another person, including the actor. Tex. Penal Code Ann. § 22.011(a)(2)(C). "Child" means a person younger than seventeen years of age. *Id.* § 22.011(c)(1).

Allison testified that McKinley's penis contacted her sexual organ. Allison also testified that she and McKinley had sex almost every day from mid-September to the end of October and that she was fifteen years old during that time period. Allison's testimony is thus sufficient to establish the elements of the offense of sexual assault for which the jury found McKinley guilty. *See Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978) (holding testimony of complainant regarding sexual offense was sufficient, standing alone); *see also* Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2014) (providing that convictions for sexual offenses are supportable on the uncorroborated testimony of a child victim under seventeen years of age). Evidence also showed that McKinley was frequently home during the day due to sporadic employment; that Allison was tardy or had unexcused absences from September 12 to October 28, 2011; and that numerous text messages were sent from the phone number attributed to McKinley to Allison's phone number and to Amanda's phone number within short periods of time, during which McKinley

could have coordinated his meetings with Allison so that they would not interfere with Amanda's visits to the apartment.

Although McKinley attacks Allison's credibility based on her prior juvenile history, the inconsistencies in her testimony regarding the day that she met McKinley at the pool, and the discrepancies between her testimony regarding the time of her daily arrivals at his apartment and Amanda's testimony that she was present in McKinley's efficiency apartment every morning at the same time, the jury was the sole judge of the weight and credibility of the evidence, and we presume the jury resolved any conflicts in favor of the verdict. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Temple*, 390 S.W.3d at 360; *see also* Tex. Code Crim. Proc. Ann. art. 38.04; *Winfrey*, 393 S.W.3d at 768. And though Detective Ripley and the investigators who examined Allison's phone testified that there was no way to prove that McKinley was the person who had sent the text messages to Allison, the jury was free to draw reasonable inferences from basic facts to ultimate facts and conclude that McKinley was the person texting Allison. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman*, 350 S.W.3d at 595.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that McKinley committed sexual assault of Allison by intentionally or knowingly causing her sexual organ to contact or penetrate his sexual organ. Consequently, we hold that the evidence is sufficient to support McKinley's conviction, and we overrule McKinley's first point. *See Jackson*, 443 U.S. at 326,

99 S. Ct. at 2793; *Campbell v. State*, No. 11-08-00202-CR, 2010 WL 2004563, at *6–7 (Tex. App.—Eastland May 20, 2010, pet. ref'd) (mem. op., not designated for publication) (holding evidence sufficient to support appellant's conviction for sexual assault of a child younger than seventeen even though there were conflicts in victim's testimony and appellant and his wife claimed that appellant had erectile dysfunction; victim testified consistently regarding where sexual assault occurred and provided details of appellant's bedroom that were consistent with what investigating deputy found). We overrule McKinley's first point.

## IV. CHALLENGE FOR CAUSE

In his second point, McKinley argues that the trial court abused its discretion by denying his challenge for cause on prospective juror number 28 and that this resulted in harm to McKinley.

We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate a prospective juror's demeanor and responses. *Gardner v. State*, 306 S.W.3d 274, 295–96 (Tex. Crim. App. 2009), *cert. denied*, 131 S. Ct. 103 (2010); *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007), *cert. denied*, 552 U.S. 1232 (2008). We will reverse a trial court's ruling on a challenge for cause only for a clear abuse of discretion. *Gardner*, 306 S.W.3d at 296. When a prospective juror's answers are ambiguous, vacillating, unclear, or contradictory, we give particular deference to the trial court's decision. *Id.*

14

A prospective juror is challengeable for cause if he or she "has a bias or prejudice in favor of or against the defendant." Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) (West 2006). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Gardner*, 306 S.W.3d at 295; *Swearingen v. State*, 101 S.W.3d 89, 99 (Tex. Crim. App. 2003). Before a prospective juror may be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Gardner*, 306 S.W.3d at 295. The proponent of a challenge for cause has the burden of establishing that the challenge is proper. *Id.* The proponent does not meet this burden until he has shown that the prospective juror understood the requirements of the law and could not overcome his bias or prejudice well enough to follow the law. *Id.* When the record reflects that a prospective juror vacillated or equivocated, we must defer to the trial judge, who had the better opportunity to see and hear the prospective juror. *Id.*; *Swearingen*, 101 S.W.3d at 99.

Harm from the erroneous denial of a defense challenge for cause occurs (1) when a defendant uses a peremptory strike to remove a prospective juror whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory strikes, and (3) the defendant unsuccessfully requests an additional peremptory strike that he claims he would use to remove another prospective juror whom the defendant identifies

15

as "objectionable" and who actually sits on the jury. *Busby v. State*, 253 S.W.3d 661, 670 (Tex. Crim. App.), *cert. denied*, 555 U.S. 1050 (2008). In these circumstances, the trial court's erroneous denial of a defense challenge for cause harms the defendant by depriving him of a statutory peremptory strike that he otherwise would have had to remove the "objectionable" juror. *Id.*

Here, the following exchange took place between the trial court and prospective juror 28 after the trial court introduced the attorneys for each side and McKinley:

> THE COURT: . . . Is there anyone who thinks you know or recognize any of these individuals I've introduced to you here today?
>
> If so, stand up and point at who it is that you knew before you walk[ed] through the back door this morning and saw them sitting in the courtroom, if anyone. All right. I see two jurors standing. 28 is standing and 26. Twenty-eight, you kind of got to your feet slightly faster. Who do you think you know or recognize?
>
> PROSPECTIVE JUROR: I know Sheila [Wynn, one of the prosecutors in the case].
>
> THE COURT: Okay. And is that personally or professionally?
>
> PROSPECTIVE JUROR: Personally.
>
> THE COURT: How long have you known Sheila?
>
> PROSPECTIVE JUROR: I guess maybe five years, four to five years.
>
> THE COURT: And what context do you all know each other?
>
> PROSPECTIVE JUROR: I coached her daughter in baseball.
>
> THE COURT: Which year did you coach her daughter?

16

PROSPECTIVE JUROR:  Let's see here, 2003 through five maybe.

. . . .

THE COURT:  . . . Is there anything about coaching Sheila's daughter or about Sheila['s] being a player['s] mom favorable or unfavorable, because I've helped coach teams, and I loved or was afraid of the parents depending on how into it they were.  I can see mixed emotions.  Is there anything about your relationship to Sheila through sports involving kids that would cause you any problem in judging the State's case?  Is there anything you would hold for or against Sheila or the State of Texas based upon your past life experience?

PROSPECTIVE JUROR:  Candidly, I really love the family, and they have a sweet daughter, and she's a good person.  I might have a bit of a bias I must say.

THE COURT:  Let me just say that.  You understand loving the family means the wife is an ADA and the husband is a criminal defense attorney which makes for interesting dinner conversation I'm sure.  But they're both good lawyers.  They're both good people.  They're both good parents.  Their daughters I have met, and they are sweet children, but the rules are this.

If you're a juror, you're supposed to judge the evidence and not the lawyers.  You're supposed to objectively listen to everyone, give everyone a fair shot, and if the evidence says guilt is proven beyond a reasonable doubt, whether you loved or hated Sheila's family, whether you enjoyed or didn't enjoy coaching her kids, you're supposed to vote guilty or not guilty based on the facts.  And the bias for Sheila as a person is okay.  The bias for the State of Texas because Sheila works for them is not okay.  Do you understand the difference?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  So you think you have a bias for or against the State of Texas?

PROSPECTIVE JUROR:  No, sir.

17

THE COURT: You just are fond of Sheila and enjoyed your association?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: If you listened to evidence and thought or had a reasonable doubt that the State proved its case, could you look Sheila in the eye and say "not guilty, you didn't prove your case," and not have guilt trips about it?

PROSPECTIVE JUROR: I think so.

THE COURT: Well, I want you to listen to everything that's being discussed, and if you think your past associations with Sheila means that you would hold that against a Defendant or for the State after you hear what the rules are when [the] lawyers talk to you, you need to let me know, but I want [you] to be thinking about what your duty is. If you can rise above the personal relationship, fine. And if it's too close and not fair, that's fine. But once you get a little more information about how the process works, just give me an honest answer before the end of the day, and I thank you for your candor.

Later in the record, the following exchange took place between defense counsel and prospective juror 28:

[DEFENSE COUNSEL]: I just wanted to revisit something really kick [sic] when you talked earlier to [the court about] Sheila. You said that you are acquainted with Sheila and her family because you coached one of her daughters.

PROSPECTIVE JUROR: Yeah.

[DEFENSE COUNSEL]: And earlier you talked to the Judge about whether you would be able to sit on this jury and look at the facts and evidence and not give Sheila's side a little bump because you know her personally, know her family. I just wanted to talk to you a little about that. My understanding is, did you tell the Judge that you could set aside and decide on these facts?

PROSPECTIVE JUROR: Yes.

18

[DEFENSE COUNSEL]: Is that going to be easy or difficult for you to do that?

PROSPECTIVE JUROR: It would be hard truthfully.

[DEFENSE COUNSEL]: Why is that?

PROSPECTIVE JUROR: You know, you have a bond with friends, no question about it, and how should I say this. You know like she and her daughter and my daughter, we as a group of the team tried to sort of win a game, and so I'm not saying I would pay back the favor, but there is a bond that happens in any sort of challenge in life that you identify with people, and so I would be untruthful to myself if I would say it would be easy to go the other way. But I'm Christian, and I'm a proud Texan, and I would have to decide based on the facts.

[DEFENSE COUNSEL]: Okay. So you would be able to -- excuse me. So you don't feel that same team spirit here in the courtroom?

PROSPECTIVE JUROR: Not necessarily, but there's no doubt I have a special bond.

[DEFENSE COUNSEL]: Okay. And tell me about how -- what process would you go through -- if you're picked on the jury, tell me what kind of process would you go through to put that out of your mind when you're trying to make the decision?

PROSPECTIVE JUROR: Just sticking to the facts. If it sounds like a he-said-she-said kind of a scenario, and maybe some other facts, I guess, and it will be interesting because I think what will reveal itself maybe in trial is children and the accused under pressure of court, and so that's really going to be something that I would be heavy weighing my evaluations on is judging the truthfulness of their testimony if they decided to take the stand.

[DEFENSE COUNSEL]: All right. Thank you so much. I appreciate that.

Defense counsel challenged prospective juror 28, which the trial court denied. Defense counsel asked for an additional strike, which the trial court also

19

denied. Defense counsel stated on the record that he had to use one of his peremptory strikes on prospective juror 28,[16] rather than on prospective juror 7, who sat on the jury and was objectionable to McKinley. *See Allen v. State*, 108 S.W.3d 281, 282 (Tex. Crim. App. 2003) (setting forth steps for appellant to preserve challenge of juror for cause for appellate review), *cert. denied*, 540 U.S. 1185 (2004).

To demonstrate harm, McKinley first must show that the trial court erroneously denied his challenge for cause of prospective juror 28. *See Busby*, 253 S.W.3d at 661; *see also Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010) (stating that to demonstrate harm, appellant must show that trial court erroneously denied one challenge for cause), *cert. denied*, 132 S. Ct. 128 (2011). Summarizing the portions of the record set forth above, prospective juror 28 indicated that he was fond of Mrs. Wynn and her family and had a special bond with them and that it would be hard for him to set that aside. But prospective juror 28 also stated that he did not have a bias for or against the State; he said that he could listen to the evidence, and if he had a reasonable doubt, he could look Mrs. Wynn in the eyes and say that she did not prove the State's case. When asked what kind of process he would go through to put that special bond

---

[16]According to the State's brief, defense counsel used peremptory strikes on prospective jurors 5, 6, 9, 21, 24, 26, 28, 35, 41, and 42; however, documentation showing these strikes was not filed with this court. *See* Tex. Code Crim. Proc. Ann. art. 35.15(b) (West 2006) (providing that in non-capital felony cases in which the State does not seek the death penalty, the State and defendant are entitled to ten peremptory challenges each).

20

with Mrs. Wynn and her family out of his mind when making a decision at the close of evidence, prospective juror 28 made clear that he would stick to the facts and weigh the truthfulness of the witnesses' testimony.

Viewing the entirety of his voir dire, prospective juror 28 stated that he did not have a bias for or against the State and that he would not allow his relationship with Mrs. Wynn's family to affect his decision making.  The record reflects that although prospective juror 28 may have vacillated initially, his answers as a whole reflect that he agreed to listen to the evidence and to follow the law.  Reviewing the trial court's ruling with considerable deference, as we must, we hold that the trial court did not abuse its discretion by denying McKinley's challenge for cause of prospective juror 28.  *See Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982) (holding that trial court did not abuse its discretion by denying challenge for cause because prospective juror stated that she could set aside her knowledge of the prosecutrix and the State's witnesses and determine the case strictly from the evidence and from the trial court's charge); *Carrasquillo v. State*, 742 S.W.2d 104, 111–12 (Tex. App.—Fort Worth 1987, no pet.) (holding that prospective juror's long-term friendship with one of the prosecutors and his statement that he was uncertain how his acquaintance with a prosecutor would affect his judgment did not establish bias as a matter of law, and thus trial court did not abuse its discretion by denying challenge for cause); *see also Bell v. State*, 724 S.W.2d 780, 797 (Tex. Crim. App. 1986) (stating that prospective juror is not subject to a challenge for cause

21

"if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court"), *cert. denied*, 479 U.S. 1046 (1987). We overrule McKinley's second point.

## V. CONCLUSION

Having overruled McKinley's two points, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 21, 2014